**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KARILIE HERRERA, FRANCHESCA MORALES, and CAROLYN RICHARDSON, | Civil Action No.:   1:20-cv-10206 |
| Plaintiffs, | ECF Action |
| -against- | |
| UNITED STATES OF AMERICA, COLIN AKPARANTA, NORMAN REID, LIEUTENANT WEST, STACEY HARRIS, OFFICER COLLIER, TROY HILL, OFFICER LEWIS, and JOHN AND JANE DOES 1-10, | **COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiffs Karilie Herrera, Franchesca Morales, and Carolyn Richardson, by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP, for their Complaint against Defendants as above captioned, allege as follows upon information and belief:

## PRELIMINARY STATEMENT

1. Colin Akparanta (hereinafter "Defendant Akparanta"), a former correctional officer at a federal jail known as Metropolitan Correctional Center - New York (hereinafter "MCC"), exploited his position to stalk, assault, and sexually abuse at least 14 inmates who were incarcerated in MCC in the custody of the United States Bureau of Prisons (hereinafter "BOP") since he started the job in 2004. Plaintiffs Karilie Herrera, Franchesca Morales, and Carolyn Richardson were each sexually abused by Defendant Akparanta on multiple occasions in 2017 and/or 2018.

2. Defendant Akparanta's abuse only came to an end when he was suspended from MCC and eventually criminally charged for sexually abusing inmates. At a plea hearing held on

March 4, 2020, Defendant Akparanta admitted to having sexual contacts with persons in BOP custody to gratify his sexual desires while in the performance of his official duties as a correctional officer in MCC. At the hearing, the government indicated that it could prove beyond a reasonable doubt that Defendant Akparanta had engaged in sexual acts with at least seven female inmates at MCC. Defendant Akparanta pled guilty and is awaiting sentencing. *See United States v. Akparanta*, 1:19-cr-00363-LGS (S.D.N.Y.).

3.    Defendant Akparanta's recurrent abuse of inmates was obvious to various agents, servants, and employees of BOP, including but not limited to his supervisors such as Defendants Norman Reid and Lieutenant West, his colleagues such as Defendants Stacey Harris and Officer Collier, and the Unit Counselors such as Defendants Troy Hill and Officer Lewis. These Defendants knew of and disregarded Defendant Akparanta's suspicious interactions with female inmates, some of which amounted to flagrant and obvious violations of MCC's security or operating protocols.

4.    For many years, BOP personnel deliberately ignored alarming warning signs as well as inmates' sex abuse allegations against Defendant Akparanta. Upon information and belief, as early as 2012, Defendants were aware of at least one prior allegation that Akparanta had sexually assaulted a female inmate in a similar location and manner as he later attacked the Plaintiffs. Nevertheless, Defendant Akparanta was only terminated in or around December 2018 and arrested in or around May 2019. With the willful ignorance and tacit approval of his supervisors and colleagues, Defendant Akparanta continued his predatory reign on Unit 2, MCC's only female dormitory unit, leaving countless victims in his wake including the Plaintiffs.

5.    It was apparent to MCC's inmates that BOP personnel would not intervene to prevent Defendant Akparanta from assaulting inmates, let alone adequately discipline, supervise,

or train him in accordance with BOP's purported zero-tolerance policy against suspected staff-on-inmate sex abuse. At least some of the individual Defendants, including Stacey Harris, Officer Collier, Troy Hill, and Officer Lewis, had explicit discussions with MCC inmates regarding Defendant Akparanta's abuse and yet refused to take steps to prevent further assaults. For example, in or prior to 2017, a female inmate confided in Defendant Officer Collier regarding Defendant Akparanta's predatory behavior and was merely told that "eventually he'll get caught."

6.      It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as abject systemic failures at MCC, that Defendant Akparanta's abuses could continue for over a decade until around December 2018.

7.      Defendant Akparanta was allowed to work shifts in which he was the only officer on guard duty in Unit 2, the female dormitory unit of MCC, performing daily rounds and "safety checks" on vulnerable inmates—thereby enabling his ongoing sexual abuse of inmates including all three Plaintiffs. Defendants Norman Reid and Stacey Harris, as part of the Unit team in charge of overseeing Unit 2, were aware of warning signs that Defendant Akparanta was abusing inmates including that he was bringing contrabands to certain inmates. In addition, Defendant Lieutenant West, as the person in charge of monitoring security cameras, knew that Defendant Akparanta often brought inmates to "Bubble" areas[1] that are not captured by security cameras and stayed there for lengthy periods of time for no apparent reason.

8.      Defendants' reckless disregard of the safety and welfare of inmates including Plaintiffs is highlighted by the fact that Defendant Akparanta is not the only correctional officer

---

[1] "The Bubble" refers to a control room that is intended as a station and/or a breakout room for Correctional Officers. It is surrounded by windows so that Officers sitting in it can look out and monitor the inmates. The Bubble is outside of the view of MCC's security cameras, and inmates are not permitted to enter the Bubble as a matter of policy and protocols.

that raped and sexually assaulted inmates at MCC. Upon information and belief, during Defendant Akparanta's tenure at MCC, at least one other Correctional Officer sexually assaulted inmates including by using the same *modus operandi* that Defendant Akparanta used, such as taking inmates to the various off-camera areas of MCC. By repeatedly failing to take adequate steps to protect inmates from foreseeable harm, Defendants permitted, condoned, approved, and/or encouraged Defendant Akparanta to sexually assault MCC's inmates.

9.      As a result, Ms. Herrera, Ms. Morales, and Ms. Richardson were each forced to engage in recurrent sexual acts and encounters with Defendant Akparanta by threats of force or coercion.

10.      Defendant Akparanta sexually assaulted Ms. Herrera from approximately November 2017 through December 2018, including by digitally penetrating her, fondling her, and having her masturbate him. He often ordered Ms. Herrera to come to the Bubble areas and assaulted her there. He also assaulted Ms. Herrera in other areas that are not visible on security cameras, including Ms. Herrera's jail cell, MCC's laundry area, and Solitary Housing Unit (hereinafter "SHU") intended for solitary confinement. Ms. Herrera was assaulted about four times on an average week.

11.      From approximately May 2017 through September 2018, Defendant Akparanta also sexually abused, harassed, and demanded sexual favors from Ms. Morales regularly. For example, when Ms. Morales was placed in the same cell as Ms. Herrera, Defendant Akparanta forced them to perform sexual acts on each other. Defendant Akparanta also forced Ms. Morales to watch or serve as a 'lookout' when he assaulted other inmates.

12.      From approximately February 2018 through November 2018, Defendant Akparanta also sexually assaulted Ms. Richardson whom he had befriended while taking her for medical

4

appointments. He emotionally manipulated her by claiming to be a reverend and offering to guide her spiritually. Especially when he was assigned to "graveyard shifts" from 12am through 8am, Defendant Akparanta came to Ms. Richardson's cell several times a week, abusing and assaulting her with increasing roughness over time.

13.    Ms. Herrera, Ms. Morales, and Ms. Richardson (hereinafter collectively "Plaintiffs") experienced catastrophic and unnecessary pain and suffering because of Defendants' egregious disregard for, and deliberate indifference to, Plaintiffs' safety and well-being. Plaintiffs suffer from debilitating psychological injuries and trauma, as a direct result of Defendants' reckless disregard of myriad warning signs and inmate complaints regarding Defendant Akparanta's abhorrent conduct for many years.

14.    Plaintiffs bring this suit pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny, for violations of their respective rights under the Fifth and Eighth Amendments to the United States Constitution for Defendants' willful failure to provide, and Defendants' withholding of, proper supervision and custodial care, which caused them to suffer cruel and unusual treatment while they were prisoners in BOP custody. Plaintiffs further bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, for negligence in connection with the deficient supervision and custodial care provided to them by each Defendant, within the scope of their employment with the BOP.

15.    Plaintiffs seek redress for Defendants' unconstitutional and otherwise unlawful conduct, which caused them to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

16.    This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b) as arising under the Constitution, laws, and/or treaties of the United

5

States of America. Plaintiffs' claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) with respect to any state law claims, as they are related to and form part of the same case or controversy as claims based on the federal Constitution, laws, and/or treaties.

17.    This Court has personal jurisdiction over the Defendants because the alleged incidents occurred within the confines of the State of New York.

18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402 (b) as a substantial part of the events giving rise to Plaintiffs' claims occurred within the boundaries of this District.

**CONDITIONS PRECEDENT TO THIS LAWSUIT**

19.    Plaintiffs have properly complied with the requirements of 28 U.S.C. § 2675 by presenting Administrative Claims against the United States of America, all of which were received by BOP on January 22, 2020.

20.    In a letter dated January 24, 2020, the BOP acknowledged receipt of these Administrative Claims but has failed to respond to same. Under 28 U.S.C. § 2675 (a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." By the filing of this action, Plaintiffs deem BOP to have finally denied Plaintiffs' Administrative Claims in their entirety.

21.    This action is timely brought pursuant to 28 U.S.C. § 2401(b) in that it is begun within six months of BOP's constructive denial of Plaintiffs' Administrative Claims.

**PARTIES**

22.    At all times relevant hereto, Plaintiff Karilie Herrera was a prisoner in the custody of BOP, incarcerated in an administrative housing facility located at 150 Park Row, New York, NY 10007, commonly known as MCC. Ms. Herrera was released from MCC in or around December 2019 and is currently housed at Bedford Hills Correctional Facility in Westchester County in the State of New York.

23.    At all times relevant hereto, Plaintiff Franchesca Morales was a prisoner in the custody of BOP, incarcerated in MCC. Ms. Morales was released from MCC in or around September 2018 and is currently housed at Federal Correctional Institution, Hazelton in Preston County in the State of West Virginia.

24.    At all times relevant hereto, Plaintiff Carolyn Richardson was a prisoner in the custody of BOP, incarcerated in MCC. Ms. Richardson was released from MCC in or around October 2020 and is currently housed at Metropolitan Detention Center in Kings County in the State of New York.

25.    Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiffs' claims under the Federal Tort Claims Act.

26.    At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at MCC and was responsible for the hiring, retention, training, supervision, discipline, and conduct of all BOP personnel, including but not limited to the Defendants referenced herein.

27.     In addition, at all relevant times, United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

28.     At all times relevant hereto, Defendant Colin Akparanta (hereinafter "Defendant Akparanta") was a Correctional Officer, and an employee of BOP and/or Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the scope of his employment as such, Defendant Akparanta was responsible for the day-to-day oversight, supervision, care, custody, and control of inmates confined at MCC, including Plaintiffs. With respect to Plaintiffs' *Bivens* claims herein, Defendant Akparanta is sued in his individual capacity.

29.     At all times relevant hereto, Defendant Norman Reid (hereinafter "Defendant Reid") was supervisory correctional personnel and/or a Unit Manager, and an employee of BOP and/or Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the scope of his employment as such, Defendant Reid was responsible for the day-to-day oversight, supervision, care, custody, and control of inmates confined at MCC, including Plaintiffs. In particular, upon information and belief, Defendant Reid was the head of the "Unit Team," a team of Correctional Officers who were in charge of providing day-to-day custodial care to inmates in Unit 2, which was MCC's only female dormitory unit until its recent closure. With respect to Plaintiffs' *Bivens* claims herein, Defendant Reid is sued in his individual capacity.

30.     At all times relevant hereto, Defendant Lieutenant West (hereinafter "Defendant West") was supervisory correctional personnel and/or a Lieutenant, and an employee of BOP and/or Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the scope of his employment as such, Defendant West was responsible

for the day-to-day oversight, supervision, care, custody, and control of inmates confined at MCC, including Plaintiffs. In particular, upon information and belief, Defendant West was in charge of overseeing and monitoring security cameras and supervising Correctional Officers such as Defendant Akparanta at all relevant times. With respect to Plaintiffs' *Bivens* claims herein, Defendant West is sued in his individual capacity.

31.    At all times relevant hereto, Defendant Stacey Harris (hereinafter "Defendant Harris") was a Correctional Officer and/or a Unit Secretary, and an employee of BOP and/or Defendant United States. In her capacity as an agent, servant, and employee of Defendant United States, and within the scope of her employment as such, Defendant Harris was responsible for the day-to-day oversight, supervision, care, custody, and control of inmates confined at MCC, including Plaintiffs. In particular, upon information and belief, Defendant Harris was a member of the Unit Team for Unit 2 and served as the secretary to Defendant Reid at all relevant times. With respect to Plaintiffs' *Bivens* claims herein, Defendant Harris is sued in her individual capacity.

32.    At all times relevant hereto, Defendant Officer Collier (hereinafter "Defendant Collier") was a Correctional Officer and/or a commissary officer, and an employee of BOP and/or Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the scope of his employment as such, Defendant Collier was responsible for the day-to-day oversight, supervision, care, custody, and control of inmates confined at MCC, including Plaintiffs. In particular, upon information and belief, Defendant Collier directly supervised MCC's inmates who worked at the jail commissary as part of their job assignments. With respect to Plaintiffs' *Bivens* claims herein, Defendant Collier is sued in his individual capacity.

9

33.    At all times relevant hereto, Defendant Troy Hill (hereinafter "Defendant Hill") was a Correctional Officer and/or a Unit Counselor, and an employee of BOP and/or Defendant United States. In her capacity as an agent, servant, and employee of Defendant United States, and within the scope of her employment as such, Defendant Hill was responsible for the day-to-day oversight, supervision, care, custody, and control of inmates confined at MCC, including Plaintiffs. In particular, upon information and belief, Defendant Hill was a member of the Unit Team for Unit 2 and served as a Counselor to the female inmates at MCC. With respect to Plaintiffs' *Bivens* claims herein, Defendant Hill is sued in her individual capacity.

34.    At all times relevant hereto, Defendant Officer Lewis (hereinafter "Defendant Lewis") was a Lieutenant and/or a Unit Counselor, and an employee of BOP and/or Defendant United States. In her capacity as an agent, servant, and employee of Defendant United States, and within the scope of her employment as such, Defendant Lewis was responsible for the day-to-day oversight, supervision, care, custody, and control of inmates confined at MCC, including Plaintiffs. In particular, upon information and belief, Defendant Lewis was a member of the Unit Team for Unit 2 and served as a Counselor to the female inmates at MCC. With respect to Plaintiffs' *Bivens* claims herein, Defendant Lewis is sued in her individual capacity.

35.    At all times relevant hereto, Defendants John and Jane Does 1-10, whose actual names are not known to Plaintiffs despite reasonable efforts to obtain such information, and who are sued herein by the fictitious designation of "John and Jane Doe," were persons in charge of the custodial care provided to Plaintiffs during relevant times. Specifically, Defendants John and Jane Does 1-10, acting within the scope of their capacity as agents, servants, and employees of BOP and/or Defendant United States, either had supervisory authority or the opportunity to observe and

intervene with respect to Defendant Akparanta's sexual abuse of MCC's inmates. With respect to Plaintiffs' *Bivens* claims herein, John and Jane Does 1-10 are sued in their individual capacities.

36.     Defendants Reid, West, and "JOHN AND JANE DOES 1-10" who served as supervisors to Defendant Akparanta are hereinafter collectively referred to as "Supervisory Defendants" for ease of reference.

37.     Defendants Harris, Collier, Hill, Lewis, and "JOHN AND JANE DOES 1-10" who acted as Defendant Akparanta's equals or colleagues are hereinafter collectively referred to as "Officer Defendants" for ease of reference.

## JURY DEMAND

38.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues and claims in this action that are so triable, including but not limited to their *Bivens* claims.

## STATEMENT OF FACTS

### INDICATIONS AND WARNING SIGNS OF AKPARANTA's ABUSE

39.     Since Defendant Akparanta was first hired by Defendant United States as a Correctional Officer at MCC in or around 2004, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel.

40.     For 14 years, Defendant Akparanta utilized similar methods to stalk, assault, abuse, and terrorize at least 14 different inmates. His routines and *modus operandi* involved flagrant violations of MCC's security and operating protocols, which were and should have been obvious to the Supervisory Defendants as well as Officer Defendants.

41.     For example, Defendant Akparanta violated MCC's protocols to bring female inmates to private areas such as "the Bubble" that are not captured by MCC's security cameras.

11

He also identified the jail cells that happen to fall outside of the view of the security cameras. He repeatedly took advantage of these known "blind spots" to brutally abuse inmates, including by forcefully digitally penetrating their vaginas, forcing them to touch his penis, forcing them to perform oral sex, fondling their breasts and buttocks, ordering them to remove their clothes, making them watch pornography on a tablet, and forcing inmates to perform sexual acts on each other while he watched and masturbated.

42.     In addition, Defendant Akparanta orchestrated unjustified lockdowns[2] as a part of his scheme to assault and abuse inmates. Upon information and belief, Defendant Akparanta sometimes put Unit 2, the female dorm, into lockdown with the sole purpose of using that time to sexually assault inmates without interruption. These lockdowns were another egregious breach of MCC's security and operating protocols that the other Defendants knew of and yet disregarded.

43.     Defendant Akparanta's routines included coercing his victims to stay silent by depositing money into their commissary accounts or bringing them 'gifts,' such as alcohol, outside clothing, cosmetics, food, beauty supplies, medications, and tampons. Correctional Officers are forbidden from giving money or personal items to inmates. Moreover, many of the gifts that Defendant Akparanta gave to his victims were contrabands forbidden by BOP policies. If BOP personnel had conducted needed investigations into the contrabands that inmates had received from Defendant Akparanta, they would have discovered Defendant Akparanta's abuse years before he came to target the Plaintiffs.

44.     The fact that Defendant Akparanta could get away with sexual abuse for many years while flagrantly violating MCC's policies led the Plaintiffs to believe that Defendant Akparanta

---

[2] "Lockdown" refers to the Correctional Officers' locking certain cells down, such that the inmates housed in those cells must remain in their cells without an ability to leave.

was 'untouchable.' Plaintiffs had legitimate concern that they would suffer retaliation or other harm if they were to report Defendant Akparanta's predatory behavior. To further fuel this fear, Defendant Akparanta verbally threatened his victims to ensure their silence. For example, Defendant Akparanta warned Ms. Herrera that he was "cool with the warden," and that he would change her cell assignments if she were to resist his demands. In or around April 2018, Defendant Akparanta in fact moved Ms. Herrera and Ms. Morales to a two-person room that was in a blind spot from security cameras, openly flaunting his power and control over Plaintiffs' lives to place them in fear of life and safety.

45.    Given the overtness and frequency with which Defendant Akparanta preyed on inmates, other BOP personnel including Supervisory Defendants and Officer Defendants suspected or should have suspected that Defendant Akparanta was abusing inmates. Nevertheless, Defendants failed to investigate, discipline, question, or stop Defendant Akparanta.

46.    From 2004 onward, Defendants had numerous opportunities to stop Defendant Akparanta's abuse. For example, Defendant West's job duties included sitting in a Bubble, monitoring the security cameras, and following up on any suspicious activities that he noticed on the cameras. Defendant West saw or should have seen that Defendant Akparanta frequently disappeared into unmonitored areas with inmates who were not authorized to be in those areas. Nevertheless, Defendant West nor any other Defendants took any actions to investigate into this suspicious and recurrent behavior.

47.    When they have a reason to suspect staff-on-inmate sex abuse, BOP personnel are required to personally inspect and investigate the situation to prevent any misconduct. Supervisory Defendants and Officer Defendants refused to take any steps to discipline, supervise, monitor, or investigate Defendant Akparanta despite numerous indications of misconduct. Therefore, these

Defendants condoned, permitted, acquiesced to, consented to, and even tacitly approved Defendant Akparanta's longstanding abuse of inmates.

48.     Defendants' behavior was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

## INMATE COMPLAINTS REGARDING AKPARANTA's ABUSE

49.     As if these warning signs were insufficient to put Defendants on notice, inmates at MCC attempted to lodge a complaint against Defendant Akparanta to various BOP personnel including the named Defendants. From 2004 onward, Defendants received several inmate complaints regarding Defendant Akparanta's misconduct.

50.     Any time a BOP personnel learns of *suspected* sexual abuse by a Correctional Officer, the BOP policy mandates that such allegation be investigated in full and be reported to the BOP Office of the Inspector General. For example, Sexually Abusive Behavior Prevention & Intervention Program requires staff to immediately safeguard an alleged victim when sexually abusive behaviors have been reported. Placing an inmate in protective custody or transferring the inmate to another federal, state, or local correctional facility are some of the viable options to safeguard an inmate.

51.     If any MCC staff detected, or even *suspected*, potential staff-on-inmate sexual abuse, they were required to immediately report that suspicion for investigation. *See* BOP Policy Number 5324.12 (referencing 28 CFR § 115.61, wherein "The agency shall require all staff to report immediately and according to agency policy *any knowledge, suspicion, or information* regarding an incident of sexual abuse or sexual harassment that occurred in a facility …; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.").

14

52.     Despite having actual notice of Defendant Akparanta's sexual abuse, Defendants neglected and refused to follow these mandatory and binding protocols in an attempt to cover up for Defendant Akparanta.

53.     At various times between 2004 and 2017, each of the Supervisory Defendants and Officer Defendants received reports or complaints regarding Defendant Akparanta from inmates who had found courage to step up.

54.     For example, upon information and belief, in or around 2012, a female inmate[3] shared her discomfort regarding Defendant Akparanta's sexual advances to Defendant Hill as the Unit's guidance Counselor. Defendant Hill and her supervisors refused to follow the mandatory protocols to properly investigate the alleged abuse, allowing Defendant Akparanta to continue to sexually abuse inmates with impunity.

55.     As another example, in 2017 and prior thereto, Defendant Collier as a commissary officer received multiple complaints regarding Defendant Akparanta from various female inmates who worked at the commissary and who chose to confide in Defendant Collier. Instead of taking inmates' complaints seriously, Defendant Collier merely told them that Defendant Akparanta will "get caught" eventually.

56.     Defendant Hill, Defendant Collier, and other Officer Defendants refused to take any action to stop Defendant Akparanta's abuse or to address inmates' legitimate concerns regarding his behavior. In the alternative, Officer Defendants did report their concerns regarding Defendant Akparanta, but Supervisory Defendants and the United States refused to take any action to investigate, supervise, discipline, or penalize Defendant Akparanta.

---

[3] For the sake of privacy, this inmate who is not a Plaintiff in this lawsuit is referred to pseudonymously in this Complaint.

57.     By 2012, Supervisory Defendants and the United States knew or should have known of Defendant Akparanta's sex abuse and of the irreparable risk of harm that he posed to inmates. These Defendants, as well as Officer Defendants, were clearly aware of Defendant Akparanta's frequent protocol violations and unexplained suspicious interactions with inmates.

58.     It is extraordinary and inexplicable that Defendant Akparanta faced no disciplinary consequences and continued working as a Correctional Officer for the female inmates of MCC.

59.     Supervisory Defendants and the United States continued to allow Defendant Akparanta to work in Unit 2 by himself, creating daily opportunities for him to commit additional sexual assaults.

## HISTORY OF STAFF-ON-INMATE SEXUAL ABUSE AT MCC

60.     Astonishingly, Defendant Akparanta was not the only Correctional Officer at MCC who exploited his position of power to prey upon female inmates. Therefore, Defendants knew that the existing MCC custom and practices were ineffective in preventing sexual abuse of inmates by Correctional Officers.

61.     For example, beginning in or around 2014, a Correctional Officer named Rudell Mullings began sexually abusing female inmates of MCC. As in Defendant Akparanta's case, other officers and supervisors turned a blind eye to Mullings's behavior, allowing him to assault and eventually rape an inmate.

62.     Upon information and belief, Defendant Collier was notified about Mullings's abuse from inmates who worked at the commissary just as he was later notified about Defendant Akparanta's abuse. Again, Defendant Collier merely told the inmates to stay away from Mullings and failed to take any further steps to report or stop Mullings.

63.     Notably, Mullings used highly similar routines and *modus operandi* as Defendant Akparanta's. For instance, Mullings took victims to the off-camera areas including the Bubble and the SHU. On November 23, 2015, Mullings pled guilty to sexually abusing an inmate at MCC. *See United States v. Mullings*, 1:19-cr-00817-ERK (E.D.N.Y.).

64.     Therefore, Defendants had actual notice and knowledge that Correctional Officers could abuse their position of power to assault inmates in off-camera areas.

65.     Nevertheless, Defendants failed to take adequate steps to prevent Defendant Akparanta from engaging in sex abuse before and after Mullings's assaults with near-identical *modus operandi*. Defendants failed to monitor the Bubble and other off-camera areas to ensure that Correctional Officers could not continue to sexually assault inmates in those areas.

66.     Defendants failed to take any steps to prevent further assaults of MCC's inmates from occurring, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to protect inmates against sexual abuse. Some but not all of MCC's blind spots were identified and ordered to be corrected during Prison Rape Elimination Act ("PREA") Audit of MCC, which occurred in April 2018.

67.     Emboldened by other Defendants' failure and/or refusal to stop him, Defendant Akparanta continued his sadistic reign on MCC's female inmates. In fact, Defendant Akparanta's unchecked predatory behavior predictably increased in scope and frequency over time. Upon information and belief, between 2017 and 2018, Defendant Akparanta sexually assaulted at least *nine* women including Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson.

**AKPARANTA's ABUSE OF PLAINTIFFS**

68.     At various overlapping periods of time between 2015 and 2018, each of the Plaintiffs became incarcerated in Unit 2 of MCC.

69.     During these times, Plaintiffs were under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including the Defendants named herein and other Correctional Officers of MCC whose identities are not presently known. As a matter of both State and Federal law, Defendants had an absolute non-delegable duty to see that prisoners in their custody receive adequate custodial care and supervision.

70.     Individual Defendants, as correctional personnel of MCC acting as agents for BOP, had the responsibility to maintain the safety, health, and well-being of inmates and to prevent inmates such as the Plaintiffs from being subjected to undue harm and/or cruel and unusual punishment. Defendants abjectly failed to carry out this responsibility.

71.     In or about 2015, Plaintiff Ms. Morales first entered MCC.

72.     Within a week of her arrival at MCC, Ms. Morales learned from other inmates that Defendant Akparanta had a reputation for being a "perv[ert]" who likes to show his private parts to female inmates.

73.     Inmates warned Ms. Morales to avoid Defendant Akparanta as much as possible. They told her that he had assaulted other female inmates before and "nothing ever happened" to him, even after an inmate had reported him to Defendant Hill in or around 2012 as described above.

74.     It is clear that by 2015, it was a common understanding among MCC's inmates that Defendant Akparanta's behavior was protected and condoned by his supervisors, including but not limited to the Supervisory Defendants.

18

75.     Ms. Morales saw Defendant Akparanta serving as a security officer for Unit 2. His shift schedule would vary: sometimes he was there for 4pm-to-12am shifts, and sometimes for 12am-to-8am "graveyard" shifts. Upon information and belief, Correctional Officers are allowed to 'bid' for a desired position or shift on a quarterly basis, and Defendant Akparanta intentionally requested to do nighttime or graveyard shifts in female dormitory with the purpose of assaulting inmates there.

76.     In or around 2016, Ms. Morales was transferred to a different BOP jail. It was when Ms. Morales returned to MCC in or around May 2017 that Defendant Akparanta began to sexually abuse her. Upon information and belief, Defendant Akparanta took an interest in Ms. Morales when he learned that she identified herself as a man.

77.     Over the next year, almost every time he was assigned to do rounds in Unit 2, Defendant Akparanta used it as an opportunity to sexually abuse, harass, or demand sexual favors from Ms. Morales. He also made cruel and demeaning remarks regarding Ms. Morales's gender identity such as "you shouldn't be who you are" and "you shouldn't be a girl."

78.     Defendant Akparanta's abuse of Ms. Morales did not stop until she was transferred out of MCC in or around September 2018.

79.     Ms. Herrera entered MCC in or around July 2017. Upon information and belief, she was a pre-trial detainee awaiting a trial at the time.

80.     Starting in or around November 2017, Defendant Akparanta also abused Ms. Herrera, sometimes by herself and sometimes together with Ms. Morales. Defendant Akparanta continued to abuse Ms. Herrera approximately four times a week over the next year.

81.     Consistent with his *modus operandi*, Defendant Akparanta took advantage of the fact that Ms. Morales and Ms. Herrera's jail cell was in an off-camera area. Defendant Akparanta

19

forced Ms. Morales to perform sexual acts on Ms. Herrera and/or their third cellmate in their shared cell while he watched or masturbated. He also made sexual demands such as ordering them to watch pornography on his tablet and instructing them not to bathe until he tells them to. He frequently taunted and threatened Ms. Morales and Ms. Herrera by telling them what time of night he will be coming to their cell.

82.    Defendant Akparanta also sometimes abused Ms. Morales and/or Ms. Herrera to in other blind spots such as the Bubble area, laundry room, or SHU. Ms. Morales and Ms. Herrera, as well as their third cellmate, sometimes argued about whose "turn" it was to go because none of them wanted to go.

83.    Inmates are not allowed in the Bubble, and therefore, Supervisory Defendants monitoring the security cameras including Defendant West were and should have been suspicious of Defendant Akparanta's recurrent behavior. Nevertheless, no BOP personnel came to investigate, intervene, or inquire as to what was happening.

84.    Defendant Akparanta frightened and terrorized Ms. Morales and Ms. Herrera to make them submit to his perverted demands. For example, he claimed to be "cool with the Warden" and told them that no one would believe them if they tried to report him. Defendant Akparanta also threatened to put Ms. Morales and Ms. Herrera in the SHU or to "ship them out" to a different jail if they did not comply with his demands. Once when Ms. Herrera told Defendant Akparanta she was going to report him, he grabbed her hand tightly and warned her not to tell anyone, which behavior implied to Ms. Herrera that he would hurt or injure her if she tried to blow the whistle.

85.    In or around April 2018, Defendant Akparanta moved Ms. Morales and Ms. Herrera from a three-person cell to a two-person cell, also in an off-camera area, with the sole purpose of

abusing them at his convenience. His ability to make such a decision further scared and traumatized Ms. Morales and Ms. Herrera.

86.     Defendant Akparanta exploited his power and authority not only to abuse Ms. Morales and Ms. Herrera but also to force them to serve as a "lookout" while he sexually assaulted other inmates, further exacerbating their psychological trauma and fear of retaliation were they to report Defendant Akparanta's abuse.

87.     Ms. Morales and Ms. Herrera often discussed between themselves their feeling of utter helplessness, how there appeared to be nothing they could do, how Defendant Akparanta appeared to 'rule everything' around them, and how they would 'pay the price' if they were to report him. They internalized the hatred that they felt against Defendant Akparanta and, in turn, felt disgusted, humiliated, and guilty.

88.     Upon information and belief, other MCC staff, including without limitation the named Supervisory Defendants and Officer Defendants, knew or should have known about Defendant Akparanta's assaults on Ms. Morales and Ms. Herrera and yet did nothing to prevent him from going on to repeatedly assault Ms. Richardson starting in or around February 2018.

89.     Ms. Richardson first encountered Defendant Akparanta in or around January 2017 when he was assigned to take her for medical appointments. At the time, Ms. Richardson was in a vulnerable position where she was losing her eyesight due to BOP medical officers' negligence. Defendant Akparanta noticed this vulnerability and emotionally manipulated Ms. Richardson.

90.     Defendant Akparanta used spirituality and Bible scripture to get close to Ms. Richardson. He claimed to be her Chaplain. He also brought her gifts such as Chinese food, Subway sandwiches, makeup, Benadryl, fruit, and alcohol, which were prohibited by BOP policy as contraband. He frequently gave these items to Ms. Richardson in a Bubble, where inmates

21

should not be allowed. Ms. Richardson came to rely upon Defendant Akparanta as a friend and someone who would be in her corner.

91.    Defendant Akparanta's ulterior motive became clear when he started holding out food and medicine in exchange for sexual favors starting in or around February 2018. Like the other Plaintiffs, Ms. Richardson felt that she could not refuse and that she would suffer adverse consequences if she tried to resist.

92.    Defendant Akparanta entered Ms. Richardson's cell several times a week to sexually assault her, including by touching, fingering, and digitally penetrating her vagina.

93.    The assaults increased in frequency when Defendant Akparanta began working primarily graveyard shifts, from 12am to 8pm, in the summer of 2018. Defendant Akparanta was the only officer assigned to Unit 2 during these hours and was free to do what he wanted without any interruption or intervention.

94.    Over time, Defendant Akparanta became increasingly physically rough with Ms. Richardson and stopped offering spiritual guidance. He also made Ms. Richardson perform additional sexual acts such as oral sex.

95.    Defendant Akparanta flaunted his knowledge regarding the coverage of security cameras, telling Ms. Richardson that her jail cell was "perfect because the cameras can't see."

96.    When he came to her cell, Defendant Akparanta shone his flashlight in Ms. Richardson's direction to let her know that he was coming. Lieutenants who were overseeing the cameras were able to see Defendant Akparanta's suspicious conduct, including disappearing into an off-camera area for lengthy periods of time. Defendant West was one of those lieutenants and knew or should have known about Defendant Akparanta's misconduct.

22

97.     Defendant West had the obligation and authority to come to Unit 2 to investigate if he noticed any suspicious behavior. When abusing Ms. Richardson, Defendant Akparanta intentionally locked the doors leading to Ms. Richardson's cell so that he would know if Defendant West or other Lieutenants came to check on him. Nevertheless, neither Defendant West nor any other BOP personnel ever actually came to investigate.

98.     In summary, Defendant Akparanta had unlimited, unmonitored access to inmates including Plaintiffs, which allowed him to sexually abuse each of them on numerous occasions between 2017 and 2018. There were many missed opportunities for Supervisory Defendants and Officer Defendants to notice and stop Defendant Akparanta's crime.

99.     In fact, at least some of the Defendants openly acknowledged that they were aware of Defendant Akparanta's abuse but that they were not willing to take further steps in response, in direct violation of BOP protocols.

100.    For example, in or around 2017, during a "town hall" meeting with Unit 2 inmates, Defendant Lewis told the assembled women, in substance or effect, "I don't want to hear nothing about my officers touching you." The gathered inmates understood Defendant Lewis to be prohibiting them from reporting Defendant Akparanta's sexual abuse despite Defendant Lewis's knowledge of same.

101.    Upon information and belief, Defendant Lewis served as a Unit Counselor for Unit 2 inmates and therefore knew or should have known about Defendant Akparanta's misconduct.

102.    As another example, from 2017 through 2018, Defendant Reid and Defendant Harris supervised the same inmates as Defendant Akparanta, albeit during different hours. Because these Defendants often started their shifts immediately after Defendant Akparanta's, Defendants Reid and Harris observed inmates with contraband that must have been given to them by a

23

Correctional Officer, heard from female inmates who expressed discomfort regarding Defendant Akparanta, and otherwise learned of Defendant Akparanta's misconduct.

103.    Defendant Akparanta frequently gave contraband items to all three Plaintiffs, including but not limited to clothes, makeup, food, perfume, and female hygiene products. Some of the contraband items such as clothes and makeup were so obvious that other inmates asked Plaintiffs where the contrabands came from.

104.    Nevertheless, Defendant Reid and Defendant Harris either failed to notice the contrabands or deliberately disregarded their significance even though they did notice them. In addition, upon information and belief, they did not perform periodic inspections or "shakedowns" of the jail cells as they were required to do.

105.    Despite being aware of Defendant Akparanta's suspicious behavior, Defendants Reid and Harris refused to take any action other than to warn inmates to "go to your cell" and to "stay away from the Bubble" when Defendant Akparanta was there. Plaintiffs understood these instructions to mean that Defendants Reid and Harris were in fact aware of Defendant Akparanta's assaults but were allowing him to continue with impunity.

106.    Defendant Akparanta himself told inmates including Ms. Herrera that Defendant Lewis and Defendant Harris were "after him," indicating that at a minimum, they were suspecting Defendant Akparanta's sexual misconduct. Nevertheless, these Defendants allowed Defendant Akparanta to continue to victimize inmates on a daily basis.

107.    As yet another example, Ms. Morales heard other female inmates discuss Defendant Akparanta's behavior with Defendant Collier, the commissary officer. Defendant Collier ignored inmates' pleas for help and simply quipped that Defendant Akparanta will "eventually get caught."

108. Upon information and belief, Defendant Collier also advised inmates not to report Defendant Akparanta to any other BOP personnel, claiming that it will be more burdensome and riskier for the inmates than beneficial.

109. Individual Defendants including Defendants Hill, Lewis, Harris, and Collier violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "*any knowledge, suspicion, or information* regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

110. In the alternative, if these Officer Defendants in fact reported their suspicion or knowledge to Supervisory Defendants including Defendants Reid or West, these Supervisory Defendants refused to take appropriate action in accordance with applicable BOP protocols and federal regulations.

111. Defendant Akparanta's assaults only came to an end when he suddenly 'disappeared' from MCC in November or December of 2018. Upon information and belief, he was suspended or terminated by BOP and/or MCC around that time due to suspicion of sex abuse.

### AFTERMATH OF DEFENDANT AKPARANTA's ABUSE

112. On or around May 21, 2019, after more than a decade of abusing his authority as a Correctional Officer to abuse more than a dozen women, Defendant Akparanta was finally arrested. Geoffrey S. Berman, then-United States Attorney for the Southern District of New York, denounced Defendant Akparanta as "a predator in uniform."

113. During the summer of 2019, the Department of Justice interviewed several of Defendant Akparanta's victims, including Ms. Herrera and Ms. Richardson, as part of the criminal proceeding against Defendant Akparanta.

25

114.    On March 4, 2020, Defendant Akparanta pled guilty to a count of abusive sexual contact, which carries a maximum sentence of two years in prison, and a count of deprivation of civil rights, which carries a maximum sentence of 10 years in prison. *See United States v. Akparanta*, 1:19-cr-00363-LGS (S.D.N.Y.).

115.    At the plea hearing, the Assistant United States Attorney stated that a search of Defendant Akparanta's locker at MCC and his cell phone revealed incriminating evidence; and that such evidence could prove beyond a reasonable doubt that Defendant Akparanta had engaged in sexual acts with at least seven female inmates at MCC. Upon information and belief, the Plaintiffs were all included among the seven referenced by the Assistant United States Attorney.

116.    To borrow from former United States Attorney Geoffrey S. Berman's description of Defendant Akparanta's plea, "[a]s he has now admitted, Colin Akparanta abused his position of authority as a correctional officer at the MCC to sexually abuse at least seven inmates whose safety and security he was duty-bound to protect."

117.    Disturbingly, after Defendant Akparanta was arrested, several MCC officers acknowledged and confirmed that they had known or suspected Defendant Akparanta's misconduct all along. For example, Defendant Harris told an inmate[4] that "I know something was happening but could never catch him," referring to Defendant Akparanta. This statement buttresses that Defendant Harris was either not properly trained regarding mandatory reporting obligations under BOP protocols and federal regulations, or that she knew of and yet deliberately disregarded those obligations.

---

[4] For the sake of privacy, this inmate who is not a Plaintiff in this lawsuit is referred to pseudonymously in this Complaint.

118.    Moreover, Plaintiffs' fear regarding potential retaliation was borne true after Defendant Akparanta's arrest. For example, Ms. Herrera was abused and harassed by an Officer Olivera, who upon information and belief was the Unit Counselor and/or a case manager who became assigned to Unit 2. Upon finding out that Ms. Herrera was interviewed by the Department of Justice, Ms. Olivera retaliated against Ms. Herrera by writing unjustified disciplinary tickets, taking away her belongings, and telling other inmates to avoid Ms. Herrera, openly calling her a "liar" who "took that poor officer's job." Ms. Olivera also violated Ms. Herrera's privacy by telling other inmates regarding the sexual assaults that Ms. Herrera suffered.

119.    Even after Defendant Akparanta was criminally indicted, the BOP did not offer proper counseling or psychological treatment to Plaintiffs.

120.    In summary, Defendants knew of and consciously disregarded the serious consequences of leaving Defendant Akparanta alone with Plaintiffs, their awareness of which is highlighted by the fact that Defendant Akparanta had previously assaulted other female inmates. By May 2017 at the latest, Supervisory Defendants and Officer Defendants knew or should have known from numerous warning signs as well as inmates' explicit complaints that Defendant Akparanta was abusing and sexually assaulting inmates housed in Unit 2. In violation of mandatory BOP policies and federal regulations, and in reckless disregard for the rights and welfare of inmates, Supervisory Defendants and Officer Defendants took no steps to keep inmates including Plaintiffs safe from Defendant Akparanta.

121.    At relevant times, Supervisory Defendants and Officer Defendants were deliberately indifferent to the risk that Defendant Akparanta would sexually assault inmates including Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson. These Defendants were well aware of facts from which the inference could be drawn that a substantial risk of serious harm

existed to inmates under Defendant Akparanta's purported custodial care. Defendants' willful withholding of proper custodial care and supervision caused Plaintiffs to suffer cruel and unusual treatment, which resulted in catastrophic injuries and damages to Plaintiffs. Defendants thus violated Plaintiffs' rights under the Fifth and Eighth Amendments to the United States Constitution.

122.    Defendants' conduct herein shocks the contemporary conscience.

123.    Specifically, Supervisory Defendants and Officer Defendants knew of and deliberately disregarded a substantial and excessive risk to Plaintiffs' safety by failing to undertake reasonable measures to prevent Defendant Akparanta's repeated sexual assaults on inmates, even though they were aware of the assaults, either directly from inmate complaints or indirectly from Defendant Akparanta's recurrent suspicious behaviors with female inmates. These Defendants refused to intervene even though they knew that their intervention could prevent the unnecessary and wanton infliction of unconscionable pain and suffering on the Plaintiffs.

124.    At relevant times, Defendants Harris, Collier, Hill, and Lewis were each notified by at least one inmate regarding Defendant Akparanta's misconduct and yet allowed him to continue to have unmonitored access to female inmates, in direct violation of applicable laws and BOP protocols. The Officer Defendants' failure to protect Plaintiffs against Defendant Akparanta's longstanding abuse, despite being on actual and constructive notice that he posed a substantial risk of serious harm, constitutes deliberate indifference to Plaintiffs' safety that cannot possibly be regarded as discretionary judgments.

125.    In addition, at relevant times, Defendants Reid and West knew about the *modus operandi* of Defendant Akparanta and yet failed to take minimum precautions including proper and adequate placement of security cameras, in direct violation of applicable laws and BOP

28

protocols. The Supervisory Defendants also failed and refused to remedy the situation by properly investigating, monitoring, disciplining, and training Defendant Akparanta. The Supervisory Defendants' failure to protect Plaintiffs against Defendant Akparanta's longstanding abuse, despite being on actual and constructive notice that he posed a substantial risk of serious harm, constitutes deliberate indifference to Plaintiffs' safety that cannot possibly be regarded as discretionary judgments.

126. By allowing Defendant Akparanta to repeatedly harm MCC's inmates, Supervisory Defendants and Officer Defendants deliberately assumed and/or acquiesced in the risk of injuring additional inmates such as the Plaintiffs. Defendants' conduct demonstrated a plain disregard of an excessive risk to inmates' safety and welfare.

127. The United States and the Supervisory Defendants knew or should have known of the substantial problems and shortcomings at MCC: in the training that staff receive regarding sexual abuse; the system for reporting sexual abuse complaints; the treatment of female inmates who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols by Defendant Akparanta; and his propensity in engaging in sexually inappropriate and abusive behavior with inmates.

128. The United States and the Supervisory Defendants knew or should have known of the systemic deficiency in having Unit 2, the only female dormitory unit in MCC housing approximately 35 inmates, be guarded by a male Correctional Officer without an accompanying or supervisory officer present. By allowing Defendant Akparanta in particular to serve this role, Defendant United States and the Supervisory Defendants knew or should have known that inmates in Unit 2, including the Plaintiffs, faced a substantial risk of being sexually abused by Defendant Akparanta.

29

129. The United States and the Supervisory Defendants knew or should have known that security cameras in the facility were improperly placed, and that certain aspects of the layout of the facility served to facilitate sexual assaults, abuse, and harassment.

130. The United States and the Supervisory Defendants failed to implement procedures or policies to ensure that inmates not be sexually assaulted.

131. The United States and the Supervisory Defendants retained Defendant Akparanta even after they received reports of his sexual abuse of inmates as early as in 2012. Moreover, Defendant Akparanta was frequently stationed as the only security guard in Unit 2, including during nighttime and early morning hours. Defendant Akparanta was also allowed to enter inmates' cells and to take them into off-camera areas without any intervention or supervision.

132. The repeated horrors that Defendant Akparanta came to inflict on the Plaintiffs occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials including the named Defendants.

133. Each Plaintiff continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life.

134. The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiffs' health and safety, Defendants' disregard of the excessive risk of harm to Plaintiffs' health and safety, and/or Defendants' negligent failure to promptly protect Plaintiffs from foreseeable assaults by Defendant Akparanta. Plaintiffs also suffer from other permanent injuries and deficits that will be established through expert consultation and/or evaluation in this litigation.

135.    Upon information and belief, Plaintiffs will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts, which are not currently provided to them. Even with such professional treatment, it is expected that Plaintiffs' injuries and damages are permanent and will continue to severely impact their health, welfare, and daily functioning.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
(*Bivens* Claim for Cruel and Unusual Punishment under the Eighth Amendment)
(Against Defendants Akparanta, Reid, West, Harris, Collier, Hill, Lewis,
and John/Jane Does 1-10, in their respective individual capacities)

136.    Plaintiffs hereby repeat, reiterate, and incorporate each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

137.    At all relevant times, Defendants were acting under color of law, *to wit*, under color of Constitution, statutes, ordinances, laws, rules, regulations, policies, customs, and usages of the United States.

138.    The Eighth Amendment to the Constitution of the United States prohibits the infliction of "cruel and unusual punishments" on those arrested and awaiting trial or those convicted of crimes, including punishments that "involve the unnecessary and wanton infliction of pain."

139.    Defendants have deprived Plaintiffs of their Constitutional rights under color of federal law and are thus liable to Plaintiffs pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny.

140.    Defendant Akparanta intentionally and repeatedly sexually abused Plaintiffs, in reckless and callous disregard for Plaintiffs' clearly established rights to be free from cruel and

unusual punishment, as guaranteed under the Fifth and Eighth Amendments to the United States Constitution.

141. Defendant Akparanta's sexual abuse of Plaintiffs was severe and repetitive, and caused Plaintiffs physical pain and emotional trauma. His assaults on Plaintiffs served no legitimate penological purpose.

142. Defendant Akparanta's sexual abuse of Plaintiffs was done with the subjective intent to gratify Defendant Akparanta's sexual desire and to humiliate Plaintiffs. Defendant Akparanta was aware of the criminal and wrongful nature of his conduct and yet refused to stop or rectify his behavior. He acted with deliberate and/or reckless disregard of the risk that Plaintiffs' constitutional and civil rights would be violated.

143. In addition, Supervisory Defendants and Officer Defendants' conduct also deprived Plaintiffs of their clearly established rights under the Fifth and Eighth Amendments to the United States Constitution to be free from cruel and unusual punishment, in that they refused to acknowledge or respond to Defendant Akparanta's history of assaults and denied adequate protection to MCC's inmates, although they knew or should have known that doing so posed an excessive and irreversible risk to Plaintiffs' safety and welfare.

144. Supervisory Defendants and Officer Defendants deliberately disregarded inmates' complaints and numerous warning signs or indications of Defendant Akparanta's inappropriate behavior. They refused to take reasonable measures to provide Plaintiffs with a reasonably safe environment, and instead allowed Defendant Akparanta to roam free in Unit 2 without any restraints or supervision.

145. Supervisory Defendants and Officer Defendants knew or should have known that there was a high degree of risk that female inmates, and Plaintiffs in particular, would be sexually assaulted by Defendant Akparanta.

146. Supervisory Defendants and Officer Defendants assisted in creating and increasing the danger to Plaintiffs by enabling, permitting, condoning, tolerating, and failing to prevent Defendant Akparanta's recurrent abuse. They enabled and acquiesced in Defendant Akparanta's conduct, thereby placing Plaintiffs directly in harm's way.

147. Moreover, Supervisory Defendants did not properly penalize, discipline, or train Defendant Akparanta to ensure that he would not continue to pose danger to inmates including the Plaintiffs. Defendant Akparanta operated with impunity in an environment in which he knew he would not be adequately supervised, trained, or disciplined.

148. Supervisory Defendants and Officer Defendants thereby effectively communicated to Defendant Akparanta that he had the freedom to harm inmates without risk of punishment.

149. Each of the Defendants affirmatively used his or her authority in a way that created a danger to Plaintiffs or that rendered Plaintiffs more vulnerable to danger.

150. Each of the Defendants acted with a degree of culpability that shocks the contemporary conscience.

151. Each of the Defendants knew of and disregarded the excessive risk of harm to Plaintiffs' health and safety.

152. Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Plaintiffs' injuries and damages, yet did not do so and instead inflicted unconscionable pain and suffering.

153.    Such actions of each Defendant caused to subject the Plaintiffs in the custody or under the physical control of the United States Government to cruel, inhuman, or degrading treatment or punishment prohibited by the Fifth and Eighth Amendments to the Constitution of the United States and constitute a blatant violation of Plaintiffs' civil rights secured by laws of the United States.

154.    As a direct and proximate result of the foregoing, Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, anxiety, frustration, loss of enjoyment and pleasures of life, and loss of quality of life, as well as attendant losses, including but not limited to any past and future medical expenses.

155.    As a direct and proximate result of the aforementioned conduct of Defendants, each Plaintiff sustained damages in an amount to be determined at trial.

156.    Plaintiffs also demand punitive damages as to this Cause of Action.

157.    Defendant Akparanta's horrific abuse constitutes willful or malicious violation of Plaintiffs' constitutional, statutory, and civil rights, which justifies an award of punitive damages.

158.    Supervisory Defendants and Officer Defendants' deliberate indifference in their refusal to provide necessary protection to vulnerable inmates including Plaintiffs and/or their direct refusal to intervene once they observed or were notified about Defendant Akparanta's sexual abuse constitutes willful or malicious violation of Plaintiffs' constitutional, statutory, and civil rights, which justifies an award of punitive damages.

159.   The egregious circumstances surrounding the treatment of Plaintiffs at relevant times, which caused them to suffer the injuries and damages as set forth above, justify an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(*Bivens* Claim for Violation of Due Process Rights under the Fifth Amendment)**
**(Against Defendants Akparanta, Reid, West, Harris, Collier, Hill, Lewis,**
**and John/Jane Does 1-10, in their respective individual capacities)**

160.   Plaintiffs hereby repeat, reiterate, and incorporate each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

161.   At all relevant times, Defendants were acting under color of law, *to wit*, under color of Constitution, statutes, ordinances, laws, rules, regulations, policies, customs, and usages of the United States.

162.   Defendants' conduct deprived Plaintiffs of their substantive due process rights protected under the Fifth Amendment to the United States Constitution, in that they failed and refused to provide Plaintiffs with proper custodial care and/or protection although they knew or should have known that doing so posed an excessive risk to Plaintiffs' safety and welfare.

163.   Defendants have deprived Plaintiffs of their Constitutional rights under color of federal law and are thus liable to Plaintiffs pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny.

164.   Defendant Akparanta intentionally and repeatedly sexually abused Plaintiffs, in reckless and callous disregard for Plaintiffs' clearly established rights to be free from cruel and unusual punishment, as guaranteed under the Fifth and Eighth Amendments to the United States Constitution.

165.    Defendant Akparanta's sexual abuse of Plaintiffs was severe and repetitive, and caused Plaintiffs physical pain and emotional trauma. His assaults on Plaintiffs served no legitimate penological purpose.

166.    Defendant Akparanta's sexual abuse of Plaintiffs was done with the subjective intent to gratify Defendant Akparanta's sexual desire and to humiliate Plaintiffs. Defendant Akparanta was aware of the criminal and wrongful nature of his conduct and yet refused to stop or rectify his behavior. He acted with deliberate and/or reckless disregard of the risk that Plaintiffs' constitutional and civil rights would be violated.

167.    In addition, Supervisory Defendants and Officer Defendants' conduct also deprived Plaintiffs of their clearly established rights under the Fifth and Eighth Amendments to the United States Constitution to be free from cruel and unusual punishment, in that they refused to acknowledge or respond to Defendant Akparanta's history of assaults and denied adequate protection to MCC's inmates, although they knew or should have known that doing so posed an excessive and irreversible risk to Plaintiffs' safety and welfare.

168.    Supervisory Defendants and Officer Defendants deliberately disregarded inmates' complaints and numerous warning signs or indications of Defendant Akparanta's inappropriate behavior. They refused to take reasonable measures to provide Plaintiffs with a reasonably safe environment, and instead allowed Defendant Akparanta to roam free in Unit 2 without any restraints or supervision.

169.    Supervisory Defendants and Officer Defendants knew or should have known that there was a high degree of risk that female inmates, and Plaintiffs in particular, would be sexually assaulted by Defendant Akparanta.

170.   Supervisory Defendants and Officer Defendants assisted in creating and increasing the danger to Plaintiffs by enabling, permitting, condoning, tolerating, and failing to prevent Defendant Akparanta's recurrent abuse. They enabled and acquiesced in Defendant Akparanta's conduct, thereby placing Plaintiffs directly in harm's way.

171.   Moreover, Supervisory Defendants did not properly penalize, discipline, supervise, or train Defendant Akparanta to ensure that he would not continue to pose danger to inmates including the Plaintiffs. Defendant Akparanta operated with impunity in an environment in which he knew he would not be adequately supervised, trained, or disciplined.

172.   Supervisory Defendants and Officer Defendants thereby effectively communicated to Defendant Akparanta that he had the freedom to harm inmates without risk of punishment.

173.   Each of the Defendants affirmatively used his or her authority in a way that created a danger to Plaintiffs or that rendered Plaintiffs more vulnerable to danger.

174.   Each of the Defendants acted with a degree of culpability that shocks the contemporary conscience.

175.   Each of the Defendants knew of and disregarded the excessive risk of harm to Plaintiffs' health and safety.

176.   Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Plaintiffs' injuries and damages, yet did not do so and instead inflicted unconscionable pain and suffering.

177.   Such actions of each Defendant caused to subject the Plaintiffs in the custody or under the physical control of the United States Government to cruel, inhuman, or degrading treatment or punishment prohibited by the Fifth and Eighth Amendments to the Constitution of the

United States and constitute a blatant violation of Plaintiffs' civil rights secured by laws of the United States.

178. As a direct and proximate result of the foregoing, Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, anxiety, frustration, loss of enjoyment and pleasures of life, and loss of quality of life, as well as attendant losses, including but not limited to any past and future medical expenses.

179. As a direct and proximate result of the aforementioned conduct of Defendants, each Plaintiff sustained damages in an amount to be determined at trial.

180. Plaintiffs also demand punitive damages as to this Cause of Action.

181. Defendant Akparanta's horrific abuse constitutes willful or malicious violation of Plaintiffs' constitutional, statutory, and civil rights, which justifies an award of punitive damages.

182. Supervisory Defendants and Officer Defendants' deliberate indifference in their refusal to provide necessary protection to vulnerable inmates including Plaintiffs and/or their direct refusal to intervene once they observed or were notified about Defendant Akparanta's sexual abuse constitutes willful or malicious violation of Plaintiffs' constitutional, statutory, and civil rights, which justifies an award of punitive damages.

183. The egregious circumstances surrounding the treatment of Plaintiffs at relevant times, which caused them to suffer the injuries and damages as set forth above, justify an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Negligence under Federal Tort Claims Act)**
**(Against Defendant United States)**

184.    Plaintiffs hereby repeat, reiterate, and incorporate each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

185.    At all relevant times, Defendant United States, individually or through its agents, servants, and/or employees including individual Defendants undertook and endeavored to, and did provide custodial care to inmates at MCC including but not limited to the Plaintiffs.

186.    At all relevant times, the individual Defendants were each a correctional and/or administrative personnel duly employed to provide custodial care and supervision to inmates incarcerated at MCC. They were hired by Defendant United States through the BOP in such capacities.

187.    The individual Defendants were federal employees and were acting within the scope of their employment with the United States when exercising custodial care, control, and supervision to Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson.

188.    At all relevant times, the individual Defendants held each of themselves out to persons incarcerated at MCC, and in particular Plaintiffs, as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

189.    Defendant United States and its employees at MCC owed a duty of care to Plaintiffs while they were housed at MCC.

190.    It was the duty of the Defendants and their agents, servants, and/or employees to ensure that Correctional Officers with history of assaults against inmates are not allowed to harm or injure other inmates.

39

191.    It was the duty of the Defendants and their agents, servants, and/or employees to maintain, operate, and control MCC as a safe and secure space for persons in it, including but not limited to Plaintiffs.

192.    It was the duty of the Defendants and their agents, servants, and/or employees to provide adequate custody, control, supervision, and monitoring to inmates at MCC, including but not limited to Plaintiffs.

193.    It was the duty of the Defendants and their agents, servants, and/or employees to adequately protect inmates including Plaintiffs from foreseeable harm inflicted by BOP personnel known to be dangerous, including Defendant Akparanta.

194.    Defendant United States of America, individually and/or through its employees, agents and/or servants including individual Defendants, acting within the scope of their office or employment, breached each of the foregoing duties that they owed to Plaintiffs by failing to take adequate steps to protect them from Defendant Akparanta within a reasonable time despite the obvious risks presented by Defendant Akparanta, a known predator in uniform.

195.    That breach directly exposed Plaintiffs to an unreasonable risk of bodily injury, caused them to fear for their life and safety, and resulted in their being sexually abused by Defendant Akparanta.

196.    Employees of the United States knew or should have known that Defendant Akparanta was likely to engage in unlawful conduct that injured Plaintiffs and other inmates of MCC.

197.    Employees of the United States knew or should have known Defendant Akparanta had a propensity to sexually abuse inmates because of the multiple reports made against Defendant Akparanta, Defendant Akparanta's suspicious practices that violated BOP and/or MCC policies

40

including his pattern of entering off-camera spaces alone with inmates and giving contrabands to inmates, and the history of inmate sexual abuse by MCC officers with similar *modus operandi* as that of Defendant Akparanta.

198.    Employees of the United States knew or should have known that Defendant Akparanta was targeting Plaintiffs, and observed or should have observed that Defendant Akparanta was approaching and interacting with Plaintiffs at specific/unusual times and in an unusual manner, such that they knew or should have known to report the behavior, investigate further and/or otherwise intervene to prevent any further sexual abuse.

199.    Despite actual and constructive notice of Defendant Akparanta's abuse, employees of the United States acted negligently in failing to take reasonable steps to prevent inmates at MCC including Plaintiffs from being preyed upon.

200.    Despite actual and constructive notice of Defendant Akparanta's abuse, employees of the United States acted negligently in hiring, training, retaining, supervising, and/or disciplining Defendant Akparanta.

201.    Despite actual and constructive notice of Defendant Akparanta's abuse, employees of the United States negligently failed to supervise, investigate, or discipline Defendant Akparanta.

202.    Defendants did not possess the necessary skill to maintain safe and secure environment and protect Plaintiffs from foreseeable harm.

203.    Defendants neglected to apply the skill they did have.

204.    Defendants did not use reasonable care in applying the skill they had.

205.    Defendants mistreated Plaintiffs and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiffs are not yet aware.

206.    At all relevant times, each of the Defendants stood in such a relationship with the other Defendants as to make each of the Defendants liable for the acts and omissions of all other Defendants with regard to their treatment of Plaintiffs.

207.    Plaintiffs' injuries herein were proximately caused by the carelessness, recklessness, gross negligence, and negligence of Defendant United States and its employees, agents, and servants, who were on duty and acting in the scope of their employment when they engaged in the wrongful conduct described herein.

208.    Plaintiffs' injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its employees, agents, and servants, and through no fault or want of care of negligence or contributory negligence on the part of Plaintiffs.

209.    The failure of Supervisory Defendants and Officer Defendants to prevent, investigate, or acknowledge Defendant Akparanta's sexual abuse served no legitimate policy purpose. On the contrary, MCC staff are required by mandatory and binding BOP policies to immediately intervene and investigate when they learned of his suspected abuse against inmates. Their failure to do so was patently outside of their discretional function or duty.

210.    Defendants' conduct was grossly negligent in that Defendants were so careless as to show complete disregard for the rights and safety of Plaintiffs.

211.    Defendants were aware of facts that gave rise to an unreasonable risk that Plaintiffs would be irreparably injured.

212.    It was foreseeable to the Defendants, based on facts known to them, that Plaintiffs were at risk of imminent serious harm.

213.    Yet, Defendants failed and/or refused to prevent the abuse of Plaintiffs or to prevent its psychological consequences from worsening to the extent that they did.

214.    The conduct of Defendants, including Supervisory Defendants and Officer Defendants, constitutes the tort of negligence under the laws of the State of New York.

215.    Under the Federal Tort Claims Act, Defendant United States of America is liable for the individual Defendants' acts and omissions that occurred within the scope of their employment as here.

216.    As a direct and proximate result of Defendants' negligence, Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, anxiety, frustration, loss of enjoyment and pleasures of life, and loss of quality of life, as well as attendant losses, including but not limited to any past and future medical expenses.

217.    As a direct and proximate result of Defendants' negligence, each Plaintiff sustained damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
**(Negligent Infliction of Emotional Distress under Federal Tort Claims Act)**
**(Against Defendant United States)**

218.    Plaintiffs hereby repeat, reiterate, and incorporate each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

219.    At all relevant times, Defendant United States, individually or through its agents, servants, and/or employees including individual Defendants undertook and endeavored to, and did provide custodial care to inmates at MCC including but not limited to the Plaintiffs.

220. At all relevant times, the individual Defendants were each a correctional and/or administrative personnel duly employed to provide custodial care and supervision to inmates incarcerated at MCC. They were hired by Defendant United States through the BOP in such capacities.

221. The individual Defendants were federal employees and were acting within the scope of their employment with the United States when exercising custodial care, control, and supervision to Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson.

222. At all relevant times, the individual Defendants held each of themselves out to persons incarcerated at MCC, and in particular Plaintiffs, as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

223. Defendant United States and its employees at MCC owed a duty of care to Plaintiffs while they were housed at MCC.

224. It was the duty of the Defendants and their agents, servants, and/or employees to ensure that Correctional Officers with history of assaults against inmates are not allowed to harm or injure other inmates.

225. It was the duty of the Defendants and their agents, servants, and/or employees to maintain, operate, and control MCC as a safe and secure space for persons in it, including but not limited to Plaintiffs.

226. It was the duty of the Defendants and their agents, servants, and/or employees to provide adequate custody, control, supervision, and monitoring to inmates at MCC, including but not limited to Plaintiffs.

227.    It was the duty of the Defendants and their agents, servants, and/or employees to adequately protect inmates including Plaintiffs from foreseeable harm inflicted by BOP personnel known to be dangerous, including Defendant Akparanta.

228.    Defendant United States of America, individually and/or through its employees, agents and/or servants including individual Defendants, acting within the scope of their office or employment, breached each of the foregoing duties that they owed to Plaintiffs by failing to take adequate steps to protect them from Defendant Akparanta within a reasonable time despite the obvious risks presented by Defendant Akparanta, a known predator in uniform.

229.    That breach directly exposed Plaintiffs to an unreasonable risk of bodily injury, caused them to fear for their life and safety, and resulted in their being sexually abused by Defendant Akparanta.

230.    Employees of the United States knew or should have known that Defendant Akparanta was likely to engage in unlawful conduct that injured Plaintiffs and other inmates of MCC.

231.    Employees of the United States knew or should have known Defendant Akparanta had a propensity to sexually abuse inmates because of the multiple reports made against Defendant Akparanta, Defendant Akparanta's suspicious practices that violated BOP and/or MCC policies including his pattern of entering off-camera spaces alone with inmates and giving contrabands to inmates, and the history of inmate sexual abuse by MCC officers with similar *modus operandi* as that of Defendant Akparanta.

232.    Employees of the United States knew or should have known that Defendant Akparanta was targeting Plaintiffs, and observed or should have observed that Defendant Akparanta was approaching and interacting with Plaintiffs at specific/unusual times and in an

45

unusual manner, such that they knew or should have known to report the behavior, investigate further and/or otherwise intervene to prevent any further sexual abuse.

233.   Despite actual and constructive notice of Defendant Akparanta's abuse, employees of the United States acted negligently in failing to take reasonable steps to prevent inmates at MCC including Plaintiffs from being preyed upon.

234.   Despite actual and constructive notice of Defendant Akparanta's abuse, employees of the United States acted negligently in hiring, training, retaining, supervising, and/or disciplining Defendant Akparanta.

235.   Despite actual and constructive notice of Defendant Akparanta's abuse, employees of the United States negligently failed to supervise, investigate, or discipline Defendant Akparanta.

236.   Defendants did not possess the necessary skill to maintain safe and secure environment and protect Plaintiffs from foreseeable harm.

237.   Defendants neglected to apply the skill they did have.

238.   Defendants did not use reasonable care in applying the skill they had.

239.   Defendants mistreated Plaintiffs and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiffs are not yet aware.

240.   At all relevant times, each of the Defendants stood in such a relationship with the other Defendants as to make each of the Defendants liable for the acts and omissions of all other Defendants with regard to their treatment of Plaintiffs.

241.   Plaintiffs' injuries herein were proximately caused by the carelessness, recklessness, gross negligence, and negligence of Defendant United States and its employees, agents, and servants, who were on duty and acting in the scope of their employment when they engaged in the wrongful conduct described herein.

242.    Plaintiffs' injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its employees, agents, and servants, and through no fault or want of care of negligence or contributory negligence on the part of Plaintiffs.

243.    The failure of Supervisory Defendants and Officer Defendants to prevent, investigate, or acknowledge Defendant Akparanta's sexual abuse served no legitimate policy purpose. On the contrary, MCC staff are required by mandatory and binding BOP policies to immediately intervene and investigate when they learned of his suspected abuse against inmates. Their failure to do so was patently outside of their discretional function or duty.

244.    Defendants' conduct was grossly negligent in that Defendants were so careless as to show complete disregard for the rights and safety of Plaintiffs.

245.    Defendants were aware of facts that gave rise to an unreasonable risk that Plaintiffs would be irreparably injured.

246.    It was foreseeable to the Defendants, based on facts known to them, that Plaintiffs were at risk of imminent serious harm.

247.    Yet, Defendants failed and/or refused to prevent the abuse of Plaintiffs or to prevent its psychological consequences from worsening to the extent that they did.

248.    These acts and/or omissions constituted extreme and outrageous conduct, and caused or disregarded a substantial probability of causing severe emotional distress to Plaintiffs. Plaintiffs' mental injury and emotional harm were a direct result of Defendants' breach of their duty of care owed to Plaintiffs.

249. The conduct of Defendants, including Supervisory Defendants and Officer Defendants, constitutes the tort of negligent infliction of emotional distress under the laws of the State of New York.

250. Under the Federal Tort Claims Act, Defendant United States of America is liable for the individual Defendants' acts and omissions that occurred within the scope of their employment as here.

251. As a direct and proximate result of Defendants' negligence, Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, anxiety, frustration, loss of enjoyment and pleasures of life, and loss of quality of life, as well as attendant losses, including but not limited to any past and future medical expenses.

252. As a direct and proximate result of Defendants' negligence, each Plaintiff sustained damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (Negligent Hiring, Retention, Training, and Supervision under Federal Tort Claims Act)
### (Against Defendant United States)

253. Plaintiffs hereby repeat, reiterate, and incorporate each of the foregoing paragraphs with the same force and effect as though fully set forth herein.

254. At all relevant times, it was the duty of the United States to hire, retain, train, and supervise its agents, servants, and/or employees to operate, maintain, and manage MCC and its various facilities including dormitory units in a reasonable manner, and to protect the health and safety of the inmates within.

255. Defendant United States was negligent in hiring, retaining, training, and

48

supervising correctional personnel such as the individual Defendants who were deliberately indifferent, careless, reckless, unskillful, grossly negligent, and negligent in rendering custodial care to inmates including Plaintiffs.

256. Upon information and belief, Defendant United States failed to use reasonable care in the hiring, retention, training, and supervision of Defendant Akparanta.

257. Upon information and belief, Defendant United States failed to use reasonable care in the hiring, retention, training, and supervision of Supervisory Defendants and Officer Defendants.

258. Upon information and belief, Defendant United States failed to meet its duty of care owed to Plaintiffs in its screening, hiring, training, supervising, evaluating, and retaining of individual Defendants.

259. Defendant United States' conduct constitutes the tort of negligent hiring, retention, training, and supervision under the laws of the State of New York.

260. Under the Federal Tort Claims Act, Defendant United States of America is liable for this negligence.

261. As a direct and proximate result of the foregoing, Plaintiffs Ms. Herrera, Ms. Morales, and Ms. Richardson each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, anxiety, frustration, loss of enjoyment and pleasures of life, and loss of quality of life, as well as attendant losses, including but not limited to any past and future medical expenses.

262. As a direct and proximate result of the foregoing, each Plaintiff sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Karilie Herrera, Franchesca Morales, and Carolyn Richardson respectfully request that judgment be entered against Defendants as follows:

a.  An award of compensatory damages for all psychological and personal injuries, past and future pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, economic damages, both general and special, and other harm, in an amount to be determined at trial;

b.  An award of punitive damages against each individual Defendant as to the First and Second Causes of Action in an amount to be determined at trial;

c.  An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

d.  An award of attorneys' fees and costs to the fullest extent permitted by law; together with

e.  Such other and further relief at law or in equity as this Court may deem just and proper.

Dated:  New York, New York
        December 4, 2020

By: _____
    Jaehyun Oh
    The Jacob D. Fuchsberg Law Firm, LLP
    3 Park Avenue, Suite 3700
    New York, New York 10016
    (212) 869-3500, ext. 245
    j.oh@fuchsberg.com

    *Attorneys for Plaintiffs*

50