UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

KARILIE HERRERA, FRANCHESCA
MORALES, and CAROLYN RICHARDSON,

                      Plaintiffs,

           -against-

UNITED STATES OF AMERICA, COLIN
AKPARANTA, NORMAN REID, LIEUTENANT
WEST, STACEY HARRIS, OFFICER COLLIER
TROY HILL, OFFICER LEWIS, and JOHN AND
JANE DOES 1-10

                  Defendants.

-------------------------------------------------------------x

                             20-cv-10206 (PKC)

                          <u>OPINION AND ORDER</u>

CASTEL, U.S.D.J.

        This civil action relates principally to sexual abuse inflicted by defendant Colin

Akparanta, a former correctional officer at the Metropolitan Correctional Center, New York

("MCC"), against inmates at the MCC for a period spanning well over a decade.[1]  (Compl. ¶ 1.)

        Plaintiffs Karilie Herrera, Franchesca Morales and Carolyn Richardson assert that

they were each sexually abused by Akparanta on multiple occasions in 2017 and 2018 while in

the custody of the United States Bureau of Prisons ("BOP") at the MCC.  (Id.)  Plaintiffs now

bring claims against Akparanta pursuant to <u>Bivens v. Six Unknown Named Agents of the</u>

<u>Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), asserting violations of rights protected by the

Fifth and Eighth Amendments to the United States Constitution.  (Compl. ¶ 14.)  Plaintiffs bring

---

[1] Akparanta pled guilty to one count of abusive sexual conduct in violation of 18 U.S.C. § 2246(2) and one count of deprivation of civil rights in violation of 18 U.S.C. §§ 2246(2) and (3), for sexually abusing inmates at the MCC from 2012 to 2018.  (Compl. ¶ 2; <u>United States v. Akparanta</u>, 19-cr-363 (LGS) (S.D.N.Y.) (Doc 43).)  He has been sentenced to principally 40 months' imprisonment. (<u>Id</u>. (Doc 60).)

the same <u>Bivens</u> claims against Norman Reid, Ronald West, Stacey Harris, Shakiyl Collier, Troylinda Hill, Nicole Lewis and John and Jane Does 1-10,[2] whom plaintiffs allege were "various agents, servants, and employees of" the BOP who "knew of and disregarded" Akparanta's suspicious interactions with female inmates, some of which amounted to flagrant and obvious violations of the BOP's and MCC's protocols. (Compl. ¶¶ 3, 14.) Plaintiffs also bring claims pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, <u>et seq.</u>, against the United States of America for negligence, negligent infliction of emotional distress, and negligent hiring, retention, training, and supervision. The United States, Reid, West, Harris, Collier, Hill and Lewis (the "Moving Defendants") now move to dismiss the Complaint under Rules 12(b)(1) and (6), Fed. R. Civ. P. Unlike Akparanta, none of the individual Moving Defendants is alleged to have directly sexually assaulted or abused one of the plaintiffs.

As will be explained, the FTCA claims against the United States (Third, Fourth and Fifth Causes of Action) are in part premised upon the actions and inactions of the individual Moving Defendants in failing to report what they knew or suspected of Akparanta's unlawful, reprehensible and repeated actions. Because the BOP maintained a mandatory reporting policy for suspected sexual abuse, the claims fall outside the discretionary function exception and the Court concludes that plaintiffs state a claim for relief on a failure to report theory. The Court also concludes under controlling Supreme Court precedent, <u>e.g.</u>, <u>Hernandez v. Mesa</u>, 140 S. Ct. 735 (2020), that plaintiffs' <u>Bivens</u> claims (First and Second Causes of Action) fall within the Supreme Court's definition of a "new context" requiring the examination of "special factors," including the availability of a remedy to plaintiffs against the United States under the FTCA.

---

[2] To date, no John or Jane Doe defendant has been identified and none have been served. The time for doing so has expired under Rule 4(m), Fed. R. Civ. P. Plaintiffs are on notice that the Court will dismiss the John Doe defendants at the expiration of 7 days from the issuance of this Opinion and Order.

Faithful to precedent, the Court concludes that the <u>Bivens</u> remedy ought not be extended in this context.

The Moving Defendants' motion to dismiss will therefore be granted in part and denied in part.

BACKGROUND

The Court summarizes the Complaint's factual allegations, and, for the purposes of the motion, accepts them as true, drawing all reasonable factual inferences in favor of the plaintiff as the non-movant.  See <u>Tandon v. Captain's Cove Marina of Bridgeport, Inc.</u>, 752 F.3d 239, 243 (2d Cir. 2014) (Rule 12(b)(1)); <u>In re Hain Celestial Grp., Inc. Sec. Litig.</u>, 20 F.4th 131, 133 (2d Cir. 2021) (Rule 12(b)(6)).  The Court will review any disputed jurisdictional facts by also referencing evidence outside the pleadings, such as affidavits.  <u>Tandon</u>, 752 F.3d at 243.

A.    <u>The Parties</u>

Plaintiffs Karilie Herrera, Franchesca Morales and Carolyn Richardson were inmates incarcerated at the MCC.  Herrera was incarcerated at the MCC from 2017 until 2019, Morales was incarcerated at the MCC from 2015 to 2016 and then from 2017 to 2018, and Richardson was incarcerated at the MCC from 2017 to 2020.  (Compl. ¶¶ 22-24, 71, 76, 78, 89.)

Defendant United States, acting through the BOP, was responsible during the relevant time period for the operation, control, supervision, policy, practice, implementation and conduct of all BOP matters including at the MCC and was responsible for the hiring, retention, training, supervision, discipline and conduct of all BOP personnel.  (<u>Id.</u> ¶¶ 26-27.)

Defendants Colin Akparanta, Norman Reid, Ronald West, Stacey Harris, Shakiyl Collier, Troylinda Hill and Nicole Lewis were all BOP employees at the MCC during the

relevant time period.[3]  (Id. ¶¶ 28-34.)  As to their Bivens claims, plaintiffs bring suit against these defendants in their individual capacities.  (Id.)

Reid was "supervisory correctional personnel" and the head or "Unit Manager" of the "Unit Team," a team of correctional officers in charge of providing day-to-day custodial care to inmates in Unit 2, which was the MCC's only female dormitory unit until its recent closure. (Id. ¶ 29.)  West was also "supervisory correctional personnel" and a "Lieutenant," in charge of overseeing and monitoring security cameras and supervising correctional officers such as Akparanta at all relevant times.  (Id. ¶ 30.)

Harris was a correctional officer and a "Unit Secretary," and was a member of the Unit Team for Unit 2 and served as the secretary to Reid at all relevant times.  (Id. ¶ 31.)  Collier was a correctional officer and a commissary officer, directly supervising the MCC's inmates who worked at the jail commissary as part of their job assignments.  (Id. ¶ 32.)  Hill was a correctional officer and a "Unit Counselor," who was a member of the Unit Team for Unit 2 and served as a counselor to the female inmates at the MCC.  (Id. ¶ 33.)  Lewis was a "Lieutenant" and a "Unit Counselor," who was a member of the Unit Team for Unit 2 and also served as a counselor to the female inmates at the MCC.[4]  (Id. ¶ 34.)

B.    Factual Background

In 2004, Akparanta was hired by the United States as a correctional officer at the MCC.  (Compl. ¶ 39.)  The Complaint alleges that, for the next 14 years, Akparanta stalked, assaulted, abused, and terrorized at least 14 different inmates at the MCC through "flagrant

___

[3] The Court will refer to Moving Defendants Reid and West as the "Supervisory Defendants" and Moving Defendants Harris, Collier, Hill and Lewis as the "Officer Defendants."

[4] The Court assumes that Lewis was also a correctional officer.  The Complaint explicitly states that Harris, Collier and Hill are correctional officers, but does not clearly do so for Lewis, describing her as a "Lieutenant and/or Unit Counselor."  The Complaint, however, notes that "Officer Lewis" was a "member of the Unit Team for Unit 2," which is described as a team of correctional officers."  (Compl. ¶¶ 29, 31-34.)

violations of MCC's security and operating protocols, which were and should have been obvious to the Supervisory Defendants as well as [the] Officer Defendants."  (Id. ¶ 40.)

For example, Akparanta violated the MCC's protocols by repeatedly bringing female inmates to private areas such as "the Bubble," which were not monitored by the MCC's security cameras.  He also identified jail cells that similarly fell outside the view of security cameras.  Akparanta took advantage of these "blind spots" to brutally abuse inmates, including by digitally penetrating inmates' vaginas by force, forcing inmates to touch his penis, forcing inmates to perform oral sex on him, fondling inmates' breasts and buttocks, ordering inmates to remove their clothes, forcing inmates to watch pornography on a tablet, and forcing inmates to perform sexual acts on each other while he watched and masturbated.  (Id. ¶ 41.)  In addition to using blind spots, Akparanta would also put Unit 2, the female inmate dorm, into unjustified lockdowns with the sole purpose of using that time to sexually assault inmates without interruption.  (Id. ¶ 42.)  In abusing inmates, Akparanta also coerced his victims to stay silent by depositing money into their commissary accounts or inappropriately bringing them "gifts" such as alcohol, outside clothing, cosmetics, food, beauty supplies, medications, and tampons—BOP policies forbid correctional officers from giving money or personal items to inmates, and many of Akparanta's "gifts" were themselves contraband forbidden under BOP policies.  (Id. ¶ 43.)

Akparanta's ability to get away with sexual abuse while flagrantly violating the MCC's policies led the plaintiffs to believe that Akparanta was "untouchable," and that they would suffer retaliation or other harm if they were to report Akparanta's abuse.  (Id. ¶ 44.) Worsening this fear, Akparanta verbally threatened his victims, such as by warning Herrera that Akparanta was "cool with the warden," and that he would change Herrera's cell assignments if she resisted his demands—indeed, in April 2018, Akparanta moved Herrera and Morales to a

"two-person room that was in a blind spot . . . openly flaunting his power and control over Plaintiffs' lives to place them in fear of life and safety."  (Id.)

Plaintiffs allege that Akparanta's abuse of inmates was "overt[]" and "frequen[t]," to the point that other BOP personnel, including the Supervisory Defendants and the Officer Defendants, either suspected or should have suspected that Akparanta was abusing inmates.  (Id. ¶ 45.)  The Supervisory Defendants and the Officer Defendants, however, failed to investigate, discipline, question or stop Akparanta, despite numerous opportunities since 2004.  (Id. ¶¶ 46, 52.)

For example, West's duties included monitoring camera blind spots (such as the aforementioned "Bubble"), monitoring security cameras and following up on any suspicious activities that he noticed on the cameras.  Plaintiffs allege that West saw or should have seen that Akparanta frequently disappeared into unmonitored areas with inmates who were unauthorized to be in those areas, but neither West nor any other defendant took any actions to investigate Akparanta's suspicious and persistent behavior.  (Id. ¶¶ 46-47.)

Plaintiffs also allege that there were several inmate complaints regarding Akparanta's abuse since 2004, which put defendants on notice of his abuse.  (Id. ¶ 49.)  Plaintiffs specifically allege that at "various times between 2004 and 2017, each of the Supervisory Defendants and Officer Defendants received reports or complaints regarding Defendant Akparanta from inmates who had found courage to step up."  (Id. ¶¶ 53-56 (giving examples of specific reports).)  Collier, in particular, refused to report multiple complaints, and in 2017, told inmates that Akparanta would "get caught" eventually, and that reporting Akparanta would be more burdensome and riskier for the inmates than beneficial.  (Id. ¶¶ 55, 108.)  Akparanta, however, faced no disciplinary consequences and continued to have daily opportunities to work

6

in Unit 2 by himself and sexually abuse inmates.  (Id. ¶ 59.)  Plaintiffs also assert that Akparanta

was not the only correctional officer at the MCC who exploited his position to sexually abuse

female inmates, and that the similar patterns of abuse by former MCC correctional officer Rudell

Mullings further put defendants on notice of Akparanta's abuse, which both predated and

followed Mullings's abuse of inmates.  (Id. ¶¶ 60-67.)

       It was a "common understanding" among MCC's inmates that Akparanta's

behavior was "protected and condoned by his supervisors," including the Supervisory

Defendants.  (Id. ¶ 74.)  As an example, in a 2017 "town hall" meeting with Unit 2 inmates,

Lewis, a counselor for Unit 2, told the assembled women, in substance or effect, "I don't want to

hear nothing about my officers touching you," which the gathered inmates understood to prohibit

them from reporting Akparanta's sexual abuse despite Lewis's knowledge of the same.  (Id.

¶ 100.)

       Plaintiffs allege that despite these overt and frequent indicators that Akparanta

was preying on inmates at the MCC, from 2017 to 2018, Akparanta was left unchecked and

inflicted horrific abuse on plaintiffs.  (Id. ¶¶ 68-111.)  For example, not only did Akparanta

frequently and perversely abuse Herrera and Morales—sometimes at the same time—he also

forced them to serve as "lookouts" while he sexually assaulted other inmates, exacerbating

Herrera's and Morales's trauma and fear of retaliation should they report his abuse.  (Id. ¶ 86.)

As another example, Akparanta first approached Richardson, who was losing her eyesight, by

holding himself out as "her Chaplain" and friend, even bringing her gifts forbidden under BOP

policy.  (Id. ¶ 89.)  Months later, however, Akparanta started demanding sexual favors and

entering Richardson's cell multiple times a week to sexually assault her.  (Id. ¶¶ 92-94.)

Akparanta's abuse only came to an end when he suddenly "disappeared" from the MCC towards the end of 2018, following suspicions of sexual abuse.  (Id. ¶ 111.)

Akparanta was eventually arrested, and as noted, pled guilty on March 4, 2020 to a count of abusive sexual contact and a count of deprivation of civil rights.  (Id. ¶ 2; United States v. Akparanta, 19-cr-363 (LGS) (S.D.N.Y.) (Doc 43).)  Following his arrest, "several MCC officers acknowledged and confirmed that they had known or suspected Defendant Akparanta's misconduct all along.  For example, Defendant Harris told an inmate that 'I know something was happening but could never catch him.'"  (Compl. ¶ 117.)  Plaintiffs also experienced retaliation. One correctional officer not named as a defendant in the Complaint allegedly retaliated against Herrera by writing unjustified disciplinary tickets, taking her possessions, calling her a "liar" who "took that poor officer's job" and telling other inmates about the traumatizing sexual assaults Herrera suffered.  (Id. ¶ 118.)

Plaintiffs allege that during Akparanta's continued abuse of inmates at the MCC, the individual Moving Defendants repeatedly violated mandatory and non-discretionary BOP policies.  For example, under BOP policies, BOP personnel were required to personally inspect and investigate situations giving rise to suspicions of staff-on-inmate sexual abuse.  (Id. ¶ 47.)  In fact, "[a]ny time a BOP personnel learns of *suspected* sexual abuse by a Correctional Officer, the BOP policy mandates that such allegation be investigated in full and be reported to the BOP Office of the Inspector General."  (Id. ¶ 50 (emphasis in original).)  Plaintiffs particularly emphasize the reporting requirements of BOP Policy Number 5324.12, which "follows the organization of the relevant portions of 28 CFR Part 115 (Prison Rape Elimination Act National Standards)" and seeks to "provide a written policy that implements zero tolerance towards all

forms of sexual activity, including sexual abuse and sexual harassment." (Doc 42-4 at 5, 1.)  As

to reporting requirements, BOP Policy Number 5324.12 states in relevant part:

> § 115.61 Staff and agency reporting duties
>
> (a) The agency shall require all staff to report immediately and according to agency policy any knowledge, *suspicion*, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility . . . .  All staff must report information concerning incidents or *possible incidents* of sexual abuse or sexual harassment . . . .  Staff must report and respond to allegations of sexually abusive behavior, *regardless of the source of the report* (e.g., 'third party')."

(Id. at 37 (emphases added).)  In other words, if any MCC staff detected, or even suspected

potential sexual abuse, they were required to immediately report that suspicion for investigation.

(Compl. ¶¶ 51, 109.)  BOP policies also mandated that BOP staff eliminate any known blind

spots and install sufficient video monitoring to protect inmates against sexual abuse, but despite

an April 2018 audit at the MCC, there remained blind spots, which could be abused.  (Id. ¶ 66.)

Plaintiffs allege that the individual Moving Defendants' failures to report or

investigate therefore amounted to condoning, acquiescing to, consenting to, or even tacitly

approving Akparanta's longstanding abuse.  (Id. ¶¶ 48, 98-99.)  Plaintiffs also allege that the

United States and the Supervisory Defendants knew or should have known of the substantial

problems at the MCC, such as: (1) staff training regarding sexual abuse; (2) reporting systems;

(3) the systemic deficiency of having Unit 2 guarded at times by a single male correctional

officer; (4) violation of security and operating protocols; (5) camera blind spots; (6) and the

actual sexual abuse by Akparanta, as early as 2012.  (Id. ¶¶ 127-131.)

As a result of Akparanta's abuse, plaintiffs continue to suffer from "debilitating

psychological trauma, permanent and catastrophic psychological injuries, severe emotional

distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life." (Id. ¶ 133.)

MOTION TO DISMISS STANDARD

A.    Rule 12(b)(1) Standard

Rule 12(b)(1) permits a defendant to move to dismiss an action for lack of subject matter jurisdiction.  A Rule 12(b)(1) motion may be either fact-based or facial.  Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016).  When the motion is directed to the face of the complaint, the court must accept all uncontroverted allegations as true and draw every reasonable inference in favor of the plaintiff.  Tandon, 752 F.3d at 243.  However, where "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to outside the pleadings, such as affidavits." Id. (internal quotation marks and citation omitted).  The party asserting subject matter jurisdiction must prove its existence by a preponderance of the evidence.  Id.  As relevant here, the "doctrine of sovereign immunity is jurisdictional in nature . . . and therefore to prevail, the plaintiff bears the burden of establishing that her claims within an applicable waiver."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  See also Cangemi v. United States, 13 F.4th 115, 129 (2d Cir. 2021).

B.    Rule 12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine

whether they plausibly give rise to an entitlement to relief." Id. at 679.  A complaint must include non-conclusory factual allegations that "'nudge[]'" its claims "'across the line from conceivable to plausible.'"  Id. at 680 (quoting Twombly, 550 U.S. at 570).

In addition to a complaint's allegations, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

DISCUSSION

A.     Appropriateness of a *Bivens* Remedy in the Instant Context

The Court concludes that the plaintiffs' claims call for an extension of a Bivens remedy to a new context, and that there are special factors here that counsel hesitation in effecting this extension.

i.     Applicable Law

To state a valid Bivens claim against a federal official in his or her individual capacity, a plaintiff must allege that he or she "has been deprived of a constitutional right by a federal agent acting under color of federal authority."  Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir. 2006).  Bivens claims, similar to suits under 42 U.S.C. § 1983, "must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); see also Thomas, 470 F.3d at 496 (requiring that a constitutional violation personally involve individual defendant).

Not all such wrongs, however, give rise to a Bivens action.  The Supreme Court previously approved three Bivens claims and has since emphasized that "expanding the . . .

remedy is now a 'disfavored' judicial activity." Ziglar v. Abbasi, 137 S. Ct. 1843, 1854-55,

1857 (2017) (quoting Iqbal, 556 U.S. at 675).  The approved claims arose in: (i) Bivens itself, a

Fourth Amendment search and seizure suit against federal narcotics officers; (ii) Davis v.

Passman, 442 U.S. 228 (1979), a Fifth Amendment due process suit against a

congressman-employer on the grounds of gender discrimination; and (iii) Carlson v. Green, 446

U.S. 14 (1980), an Eighth Amendment cruel and unusual punishment suit against federal jailers

for failure to provide adequate medical treatment.  See Ziglar, 137 S. Ct. at 1854-55.  "After

those decisions, however, the Court changed course," and has "consistently rebuffed requests to

add to the claims allowed under Bivens."  Hernandez v. Mesa, 140 S. Ct. 735, 741, 743 (2020).

          Under current Supreme Court precedent, a bifurcated framework governs whether

a Bivens action should proceed.  First, the court determines "whether the request involves a

claim that arises in a 'new context'" for a Bivens action.  Id.  The court's "understanding of a

'new context' is broad," and the court "regards a context as 'new' if it is different in a

meaningful way from previous Bivens cases decided by" the Supreme Court.  Id. (quoting

Ziglar, 137 S. Ct. at 1859).  For example, "[a] claim may arise in a new context even if it is based

on the same constitutional provision as a claim in a case in which a damages remedy was

previously recognized."  Id.  While recognizing that its list of potential differences was

instructive, and not exhaustive, the Supreme Court has explained that a case may differ in a

meaningful way

> because of the rank of the officers involved; the constitutional right
> at issue; the generality or specificity of the official action; the
> extent of judicial guidance as to how an officer should respond to
> the problem or emergency to be confronted; the statutory or other
> legal mandate under which the officer was operating; the risk of
> disruptive intrusion by the Judiciary into the functioning of other
> branches; or the presence of potential special factors that previous
> *Bivens* cases did not consider.

<u>Ziglar</u>, 137 S. Ct. at 1859-60.  "[T]he new-context inquiry is easily satisfied" by even "small" differences between the claim at issue and the previously approved <u>Bivens</u> claims "[g]iven [the Supreme] Court's expressed caution about extending the . . . remedy."  <u>Id.</u> at 1865 (noting, however, that some differences will be "so trivial" that they do not create a new <u>Bivens</u> context).

Second, if the case presents a new context, the court then asks "whether there are any 'special factors that counsel hesitation' about granting the extension."  <u>Mesa</u>, 140 S. Ct. at 743 (brackets omitted) (quoting <u>Ziglar</u>, 137 S. Ct. at 1857).  If there are such special factors, then the court must reject the request to extend a <u>Bivens</u> remedy to the new context.  <u>Id.</u>

The Supreme Court has "not attempted to 'create an exhaustive list' of factors that may provide a reason not to extend <u>Bivens</u>, but [it has] explained that 'central to [this] analysis] are 'separation-of-powers principles.'"  <u>Id.</u> (quoting <u>Ziglar</u>, 137 S. Ct. at 1857).  Courts should "consider the risk of interfering with the authority of the other branches, and [] ask whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy' . . . and 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weight the costs and benefits of allowing a damages action to proceed.'"  <u>Id.</u> (quoting <u>Ziglar</u>, 137 S. Ct. at 1858).  As relevant here, "[i]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the [j]udiciary to infer a new . . . cause of action."  <u>Ziglar</u>, 137 S. Ct. at 1858.  Additionally, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation."  <u>Id.</u> at 1865.  The presence of such factors, along with any other "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system," requires a court to "refrain from creating the remedy."  <u>Id.</u> at 1858.

ii.   <u>Application</u>

The crux of the plaintiffs' <u>Bivens</u> claims is that the Supervisory Defendants and the Officer Defendants, in their individual capacities, showed "deliberate indifference in that they refused to take reasonable measures to protect Plaintiffs from the known risk of sexual attacks and created an environment in which such attacks were likely to persist."[5]  (Ptf. Br. at 10.)

These claims, however, arise in a "new context" for the purposes of the bifurcated <u>Bivens</u> analysis.  As noted, the Supreme Court in <u>Carlson</u> concluded that there was an implied damages remedy for an Eighth Amendment violation where federal prison staff allegedly failed to provide adequate medical care to an inmate.  Although <u>Carlson</u> and the instant case both occurred in the setting of a federal prison, the instant case differs in a meaningful way.  While each is equally unacceptable in a civilized society, failure to provide adequate medical care to inmates is a substantively different context from BOP employees' failure to protect inmates from repeated sexual abuse by another BOP colleague or subordinate.  Given the Supreme Court's reiterated caution against extending <u>Bivens</u> remedies, even "modest[ly]," <u>Ziglar</u>, 137 S. Ct. at 1864, this substantive difference between <u>Carlson</u> and plaintiffs' claims is sufficient to establish the instant case as a "new context" for <u>Bivens</u> purposes.

Separately, the Court notes that <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), on which plaintiffs rely, did not extend <u>Bivens</u> remedies to a new context of protecting inmates from sexual abuse.  Rather, <u>Farmer</u> focused on defining what "deliberate indifference" meant for

---

[5] Plaintiffs explain in their brief that their Fifth Amendment <u>Bivens</u> claims are meant to invoke the Eighth Amendment type protection against cruel and unusual punishment for pre-trial detainees.  (Ptf. Br. at 10 n.8 ("To the extent that Plaintiffs suffered Akparanta's abuse during pre-trial detention, they were also protected by the Fifth Amendment's Due Process Clause . . . .  Pre-trial detainee's rights governed by the Fifth Amendment 'are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" (citing <u>Darnell v. Pineiro</u>, 101 F.3d 845, 856 (2d Cir. 2017)).

pleading Eighth Amendment violations.  See id. at 836 (concluding that deliberate indifference is properly equated with the mens rea of "recklessness").  See also Darnell v. Pineiro, 849 F.3d 17, 32 (2d Cir. 2017) (summarizing Farmer).  Furthermore, the Supreme Court itself has not treated Farmer as a case that extended a Bivens remedy to a new context.  For example, the Supreme Court has clearly stated that it "changed course" after its three decisions in Bivens, Davis and Carlson, which all predated Farmer, and that in "later years, [the Supreme Court] came to appreciate more fully the tension between this practice [of implying causes of action] and the Constitution's separation of legislative and judicial power."  Mesa, 140 S. Ct. at 741.

Plaintiffs also cannot extrapolate a Bivens extension from the Supreme Court's comment that "[i]f a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a Bivens claim against the offending individual officer, subject to the defense of qualified immunity."  Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 72 (2001).  Read in the context of Supreme Court precedent following Bivens, Davis and Carlson, Malesko does not stand for the extension of Bivens to all "constitutional deprivation[s]" alleged by a federal prisoner in a BOP facility.  Malesko instead focused on the Supreme Court's *refusal* to extend Bivens claims in the case, specifically, against a private corporation operating a halfway house under contract with the BOP.  Id. at 63, 74.

The Court also concludes that the instant case presents "special factors" that "counsel hesitation" to extending a Bivens remedy here.  As noted, "[i]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the [j]udiciary to infer a new . . . cause of action."  Ziglar, 137 S. Ct. at 1858.  Additionally, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation."  Id. at 1865.  Here, as reviewed above, plaintiffs are pursuing an available alternative

remedy under the FTCA.  Although the <u>Carlson</u> court acknowledged the availability of an FTCA

remedy before allowing that action to proceed, 446 U.S. at 19, the <u>Ziglar</u> court noted that

<u>Carlson</u>, like the other previously approved <u>Bivens</u> actions, "might have been different if [it]

were decided today," <u>Ziglar</u>, 137 S. Ct. at 1856.  The Court thus concludes that the existence of

the FTCA as a potential remedy "counsel[s] hesitation" in extending a <u>Bivens</u> remedy to

plaintiffs' claims.  Additionally, Congress had "specific occasion to consider the matter of

prisoner abuse and to consider the proper way to remedy those wrongs" when it enacted the

Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e ("PLRA").  <u>Ziglar</u>, 137 S. Ct. at 1865.

The PLRA "does not provide for a standalone damages remedy," suggesting that Congress

"chose not to extend" the <u>Carlson</u> remedy "to cases involving other types of prisoner

mistreatment."  <u>Id.</u>  As relevant here, the PLRA also defines "prisoner" to include pretrial

detainees.[6]  <u>See</u> 42 U.S.C. § 1997e(h).

Accordingly, the Court declines to extend the <u>Bivens</u> remedy to plaintiffs' claims.

The motion to dismiss the <u>Bivens</u> claims against the Supervisory Defendants and the Officer

Defendants will be granted.

B.    <u>Appropriateness of FTCA Claims in the Instant Context</u>

The Court concludes that the discretionary function exception to the FTCA's

limited waiver of sovereign immunity does not bar plaintiffs' FTCA claims against the United

States for negligence, negligent infliction of emotional distress, and negligent hiring, retention,

training, and supervision.

---

[6] The Complaint alleges that at least Herrera was a pre-trial detainee when she entered the MCC in 2017.  (Compl. ¶ 79.)

i.    <u>Applicable Law</u>

As a jurisdictional matter, "[a]bsent an unequivocally expressed statutory waiver, the United States . . . [is] immune from suit based on the principle of sovereign immunity." <u>Cangemi</u>, 13 F.4th at 129 (quoting <u>Cnty. of Suffolk v. Sebelius</u>, 605 F.3d 135, 130 (2d Cir. 2010)).  As relevant here, "[t]he FTCA provides for a limited waiver of sovereign immunity for 'injury or loss of property . . . caused by the negligent or wrongful act or omission' of a federal government employee 'acting within the scope of his office or employment.'" <u>Id.</u> at 129-30 (quoting 28 U.S.C. § 1346(b)(1)).  The FTCA, however, "is limited by a number of exceptions, including the so-called 'discretionary function exception,' which bars '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" <u>Id.</u> at 130 (quoting 28 U.S.C. § 1346(b)(1)).  "Thus, for acts that fall under the discretionary function exception, the United States has not waived its sovereign immunity, and federal courts lack subject matter jurisdiction over claims premised on those acts." <u>Id.</u> (citing <u>Fazi v. United States</u>, 935 F.2d 535, 537 (2d Cir. 1991)).  Plaintiffs bear this "initial burden of showing that their claims are not barred by the discretionary function exception" and that "their claims against the United States fall within the FTCA's limited waiver of sovereign immunity." <u>Id.</u>

The Supreme Court has developed a two-part framework known as the "<u>Berkovitz</u>/<u>Gaubert</u>" test for determining whether the discretionary function exception applies to a given FTCA claim. <u>Id.</u> (citing <u>United States v. Gaubert</u>, 499 U.S. 314, 322-23 (1991); <u>Berkovitz v. United States</u>, 486 U.S. 531, 536-37 (1988)).  "Under the <u>Berkovitz</u>/<u>Gaubert</u> test, the discretionary function exception bars a claim where '(1) the acts alleged to be negligent [or

17

wrongful] . . . [are] discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation and (2) the judgment or choice in question [is] . . . grounded in consideration of public policy or susceptible to policy analysis." Id. (quoting Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000)).

In other words, "[p]laintiffs can overcome a motion to dismiss premised on the discretionary function exception by showing that *either* (1) the [federal government employee's] allegedly tortious act (or failure to act) was inconsistent with a 'specific mandatory directive'— *i.e.*, a 'federal statute, regulation, or policy [that] specifically prescribes a course of action for [the federal government] to follow,' . . . *or* (2) the allegedly tortious 'judgment or choice in question' is not 'grounded in considerations of public policy or susceptible to policy analysis." Id. (emphases in original) (citing Berkovitz, 485 U.S. at 536; Coulthurst, 214 F.3d at 109).

ii.    Application

Plaintiffs allege that the Supervisory Defendants' and Officer Defendants' failures to report suspicions or knowledge of Akparanta's abuse violated a specific and mandatory directive: BOP Policy Number 5324.12, which references 28 CFR § 115.61 and requires all MCC staff to immediately report any suspicions of sexual abuse against an inmate for investigation. (Compl. ¶¶ 51-52.)  The Moving Defendants respond that "non-discretionary investigative *steps* do not render BOP's regime for supervision, discipline, and retention non-discretionary because nothing in the regulations or policies mandate a particular outcome for any investigation."  (Def. Reply Br. at 7-8 (emphasis in original).)

The Court concludes that for jurisdictional purposes, plaintiffs have adequately alleged that the Supervisory Defendants and the Officer Defendants, acting in the scope of their employment under the United States through the BOP, violated the BOP's specific policy

mandate that knowledge and even suspicions of sexual abuse be immediately reported. When considering the Complaint's factual allegations and the BOP's "zero tolerance" policy "requir[ing] all staff to report immediately" "any knowledge, suspicion, or information regarding" sexual abuse (Doc 42-4 (BOP Policy Number 5324.12) at 1, 37), the Court comfortably concludes that Akparanta's colleagues and supervisors at the MCC did not have the discretion to turn a blind eye to "knowledge, suspicion or information" concerning his sexual abuse of inmates. Reporting is mandatory and plaintiffs allege that the mandatory reporting by the Supervisory Defendants and the Officer Defendants did not take place.

Accordingly, the Court concludes that the plaintiffs' FTCA claims against the United States do not fall under the discretionary function exception. The motion to dismiss the FTCA claims against the United States for lack of subject matter jurisdiction is therefore denied.[7]

CONCLUSION

The Court has considered all the arguments of the parties, whether or not they are expressly referenced here. The motion to dismiss the Complaint is GRANTED as to the plaintiffs' Bivens claims against Reid, West, Harris, Collier, Hill and Lewis, and is DENIED as to the plaintiffs' FTCA claims against the United States. The Clerk is respectfully directed to terminate the motion (Doc 40).

---

[7] The Court notes that it is unnecessary to analyze whether plaintiffs have plausibly alleged a claim to relief for their three tort claims brought under the FTCA, as the Moving Defendants only move to dismiss the FTCA claims for a lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P., and not for a failure to plausibly state a claim to relief under Rule 12(b)(6), Fed. R. Civ. P.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 27, 2022